## POTOMAC ELECTRIC POWER COMPANY, Petitioner,

v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

FirstEnergy Corp., et al., Intervenors.

No. 99–1209.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 24, 2000.

Decided May 2, 2000.

Steven J. Ross argued the cause for petitioner. With him on the briefs were Allen C. Barringer, David B. Raskin and Cynthia L. Taub.

Lona T. Perry, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was John H. Conway, Deputy Solicitor. Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel, entered appearances.

Kevin J. McIntyre and Leonard W. Belter were on the brief for intervenors FirstEnergy Corp., et al.

Before: WILLIAMS, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Potomac Electric Power Company ("PEPCO") petitions for review of two orders of the Federal Energy Regulatory Commission ("FERC") denying its request under § 206 of the Federal Power Act ("FPA"), 16 U.S.C. § 824e (1994), for unilateral modification of the rates prescribed by a long-term, fixed rate, power transmission service agreement between PEPCO and the Allegheny Power System ("APS"). Because FERC did not abuse its discretion in applying the stringent *Mobile-Sierra* public interest standard, and because a mere rate disparity or a benefit to the purchasing utility or its customers from a rate modification does not suffice, without more, to satisfy that standard, we conclude that FERC's decision to dismiss the complaint was a reasonable exercise of its authority. Accordingly, we deny the petition.

## I.

In 1987, PEPCO entered into an 18.5 year power supply agreement with the Ohio Edison System, which was comprised of Ohio Edison Company and Pennsylvania Power Company. In order to effect delivery of the power to PEPCO's service area, PEPCO and the Ohio Edison System each entered into a transmission service agreement with the APS, an integrated electric utility system directly connected to both PEPCO and the Ohio Edison System. Under the three agreements, PEPCO would purchase contract entitlements to a share of the Ohio Edison System's installed generating capacity and associated energy, APS would purchase from the Ohio Edison System the power intended for PEPCO, and APS would, in turn, resell the power purchased from the Ohio Edison System to PEPCO. The dispute in the

instant case involves the agreement between PEPCO and APS.

PEPCO's agreement with APS provided in relevant part that the base rate for the APS transmission service would commence at $1.70 per kW-month, increase to $2.255 per kW–month in 1994, and increase again to $2.815 per kW-month in 1999. In addition, the agreement required PEPCO to pay an "adder" of $1.00 per megawatt-hour for each megawatt-hour of energy that APS delivered. Furthermore, the agreement was a "fixed rate" contract, meaning that the parties agreed not to unilaterally request a rate change from the Commission, as provided in section 9.3 of the agreement, which stated:

> It is the intention of the parties that the rates and terms of service specified herein shall remain in effect for the entire term set forth in this Article, and shall not be subject to change pursuant to the Federal Power Act absent mutual agreement of the parties or as provided in section 3.4.

Section 3.4, in turn, provided for renegotiation "[i]n the event that reasonably unforeseeable circumstances beyond the control of any party to this Agreement result in a gross inequity to any party" and outlined a procedure for dispute resolution in case parties fail to reach a new agreement.

APS submitted the three agreements for FERC approval in March 1987. *See Monongahela Power Co.*, 39 F.E.R.C. ¶ 61,350, *reh'g denied*, 40 F.E.R.C. ¶ 61,-256 (1987). In its review of the filing, FERC noted that PEPCO represented that "the rate levels are completely justified on the basis of cost factors." *Id.* at 62,093. Also as recounted by FERC at the time, PEPCO maintained that "once rates are determined to be cost-justified, the noncost factors such as the potential

savings to PEPCO are superfluous, and the filing cannot be deemed deficient even if the noncost support were deemed insufficient." *Id.* FERC also noted that "[n]o party to [the] proceeding has alleged that the rates under the three proposed agreements are unjust and unreasonable," and that "[o]ur review indicates that the rates to PEPCO will not generate excessive revenues and should be accepted for filing without suspension." *Id.* at 62,096. FERC accepted the three contracts for filing to become effective June 1, 1987. *See id.* at 62,098.

In 1996, FERC issued the first in a series of orders known collectively as "Order No. 888" to address problems associated with electric transmission monopolies in the bulk power markets. *See Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities*, 61 Fed. Reg. 21,540 (1996), *codified as revised at* 18 C.F.R. Pts. 35 & 385 (1999).[1] The Order required all public utilities that own, operate, or control interstate transmission facilities to file an open access nondiscriminatory transmission tariff. *See id.* at 21,540. In its open access transmission tariff ("OATT") proceeding pursuant to Order No. 888, APS agreed to charge a rate of $1.49 per kW-month for its transmission service, a rate substantially less than the rate PEPCO was obligated to pay under its 1987 agreement with APS.

Thereafter, PEPCO filed a complaint against APS, requesting that FERC summarily order APS to reduce the rate for transmission services under the 1987 agreement to the same level as APS's rate for comparable service under its OATT. The Federal Power Act provides that electricity rates may be modified in one of two ways: under § 205, the seller may attempt to prompt rate changes by filing a new

---

1. For the revisions and clarifications of Order No. 888, see 76 F.E.R.C. ¶ 61,009 (1996), 76 F.E.R.C. ¶ 61,347 (1996), and 79 F.E.R.C. ¶ 61,182 (1997), *on reh'g*, Order No. 888–A, 62 Fed.Reg. 12274 (1997), *on reh'g*, Order No. 888–B, 81 F.E.R.C. ¶ 61,248 (1997), *on reh'g*,

Order No. 888–C, 82 F.E.R.C. ¶ 61,046 (1998), *on appeal sub nom. Transmission Access Policy Study Group, et al. v. FERC*, No. 97–1715 (D.C.Cir.) (submitted November 3, 1999).

rate schedule, which will be reviewed by FERC to determine whether the proposed rates are just and reasonable, *see* 16 U.S.C. § 824d, and under § 206, FERC may reform the rates "upon its own motion or upon complaint" if it determines the rates have become "unjust, unreasonable, unduly discriminatory or preferential." *Id.* § 824e(a). PEPCO's request for a rate decrease, claiming that APS's rate was "excessive and unreasonable," asked FERC to exercise its authority under § 206 to modify existing contracts and reduce the contractual transmission rate to the OATT rate.

APS moved to dismiss the complaint, citing section 9.3 of the agreement under which the parties had agreed to eliminate the right of either party to initiate rate modification pursuant to FERC's § 206 authority. APS relied primarily on the "*Mobile-Sierra*" doctrine, named after the two Supreme Court cases that established the "public interest" standard for FERC review of electricity rates in contracts restraining unilateral rate changes. *See United Gas Pipe Line Co. v. Mobile Gas Serv.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *Federal Power Comm'n v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Under the public interest standard of the *Mobile-Sierra* doctrine, FERC has § 206 authority to modify rates "fixed" by a *Mobile-Sierra* provision " 'where [the existing rate structure] might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.' " *Papago Tribal Util. Auth. v. FERC*, 723 F.2d 950, 953 (D.C.Cir.1983) (alteration in original) (quoting *Sierra*, 350 U.S. at 355, 76 S.Ct. 368); *see also Metropolitan Edison Co. v. FERC*, 595 F.2d 851, 855 (D.C.Cir.1979). In essence, APS maintained that PEPCO failed to make the required showing under the *Mobile-Sierra* doctrine that the public interest was adversely affected by the existing contract.

In response, PEPCO asserted that the public interest was adversely affected by the contractual rate because the excessive rates were entirely borne by its ratepayers. PEPCO also maintained that because of APS's market power, it had little bargaining power at the time it entered the agreement to influence the terms of the contract, including the *Mobile–Sierra* provision in section 9.3. Furthermore, PEPCO contended that the rate APS charged itself and others, approximately half of what PEPCO was being charged for the same service, constituted undue discrimination prohibited under the *Mobile-Sierra* doctrine.

FERC dismissed PEPCO's complaint. *See Potomac Elec. Power Co. v. Allegheny Power Sys.*, 85 F.E.R.C. ¶ 61,160 (1998). Emphasizing that it "does not take contract modification lightly," FERC reasoned that the mere fact that PEPCO was subject to higher rates under its agreement with APS than it would be under APS's OATT was insufficient reason for abrogating an agreement that PEPCO had fully supported at the time of filing and FERC had approved as just and reasonable. *Id.* at 61,632–33. FERC also rejected PEPCO's request that it act *sua sponte* to reduce the rates for the benefit of PEPCO's ratepayers, reasoning that it would be inappropriate to convert PEPCO's unilateral request for reformation into a FERC-initiated contract modification where the parties' agreement contained a *Mobile-Sierra* provision, and where PEPCO had failed to satisfy the public interest standard. *See id.* at 61,633.

In denying PEPCO's petition for rehearing, FERC rejected PEPCO's contention that FERC had erred by failing to assess whether the rates were just and reasonable, and defined the issue instead to be whether the rates, having been found to be just and reasonable when originally approved, had become contrary to the public interest. *See Potomac Elec. Power Co. v. Allegheny Power Sys.* 87 F.E.R.C. ¶ 61,030, at 61,105 (1999). FERC noted that, under

its precedent, the fact that a contract has become uneconomic to one of the parties does not necessarily make the contract contrary to the public interest under the FPA. FERC found no reason to deviate from this precedent because PEPCO failed to present any other ground for finding the agreement contrary to the public interest. *See id.* Responding to PEPCO's argument that the contract was the result of uneven bargaining power and that FERC's failure to modify the rates rested on its faulty assumption that PEPCO had willingly entered into the agreement, FERC stated first, that PEPCO's contention was inconsistent with PEPCO's representations in 1987, *see id.* at 61,106 n. 10, and second, that FERC's decision was based not on PEPCO's initial willingness to enter the agreement, but on PEPCO's failure to demonstrate that revising the agreement was in the public interest. *See id.* at 61,106. Finally, in response to PEPCO's request that FERC follow the approach it had adopted in Order No. 888 to allow modification where rates are shown to be no longer just and reasonable, FERC deemed the request misplaced because its Order No. 888 *Mobile-Sierra* finding applied only to a discrete set of wholesale requirements contracts, not to transmission contracts like the one at issue. *See id.* at 61,106 n. 11.

## II.

On appeal, PEPCO contends that by emphasizing only the policies favoring fixed rate contracts and ignoring the FPA's concerns with fairness and anti-competitiveness, FERC failed to meet the FPA's mandate. More specifically, PEPCO first maintains that FERC's application of the *Mobile-Sierra* public interest standard ignored FERC's precedent calling for a "flexible" version of the test in situations where FERC is acting or is requested to act on behalf of non-party ratepayers that are affected by the contract. Even if FERC applied the correct "version" of the standard, PEPCO main-

tains second that FERC failed to fulfill its obligation under the public interest standard to ensure that the rates charged under PEPCO's agreement with APS are neither unduly discriminatory nor excessively burdensome on PEPCO's ratepayers. Nor had FERC, PEPCO continues, taken into account that the agreement was the result of uneven bargaining power, even though FERC had stated this factor was relevant to a public interest analysis and had made a general finding that transmission contracts entered into before Order No. 888 often reflected the exercise of market power. In other words, PEPCO submits, FERC acted arbitrarily and capriciously by not applying a flexible public interest standard and, alternatively, by concluding that PEPCO had not met its burden under the stringent *Mobile-Sierra* public interest standard.

■ The court will uphold FERC's orders unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Likewise, the court will uphold FERC's factual findings as long as they are supported by substantial evidence. *See* 16 U.S.C. § 825*l*(b); *see also Texaco, Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C.Cir.1998) (citing *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814 (D.C.Cir.1998)). We hold that FERC's decision to dismiss the complaint was not an unreasonable exercise of its authority.

■ PEPCO concedes, implicitly in its briefs and explicitly at oral argument, that the public interest standard set out in *Mobile* and *Sierra*, and not the just and reasonable standard, controls PEPCO's § 206 request. The court has observed that the *Mobile-Sierra* public interest standard is much more restrictive than the FPA's "just and reasonable" standard, *see, e.g., Union Pacific Fuels, Inc. v. FERC*, 129 F.3d 157, 161 (D.C.Cir.1997); *San Diego Gas & Elec. Co. v. FERC*, 904 F.2d 727, 730 (D.C.Cir.1990), even characterizing the burden under the public interest standard as "practically insurmountable," *Papago,*

723 F.2d at 954, and "almost insurmountable." *Kansas Cities v. FERC*, 723 F.2d 82, 87–88 (D.C.Cir.1983); *see also Tennessee Gas Pipeline Co.*, 60 F.E.R.C. ¶ 61,318, at 62,104 (1992); *Central Maine Power Co.*, 54 F.E.R.C. ¶ 61,206, at 61,613–14 (1991). PEPCO challenges such a restrictive characterization of the standard, and contends that FERC was bound by its own precedent to adopt an approach "less restrictive" than the *Papago* court's phrase "practically insurmountable" suggests.

For this proposition, PEPCO relies on *Northeast Utilities Service Company*, 66 F.E.R.C. ¶ 61,332 (1994), *aff'd* 55 F.3d 686 (1995). In *Northeast Utilities*, FERC, reviewing a rate agreement in connection with a utility merger, modified a fixed-rate contract "under the public interest standard required by the *Mobile-Sierra* doctrine." *Id.* at 62,076. In modifying the contract, FERC rejected the proposition that the *Mobile-Sierra* doctrine requires a generally applicable standard that is so stringent as to be "practically insurmountable." FERC explained:

> [I]f the Commission is to comply with both the *Mobile–Sierra* imperative to respect contractual arrangements, on the one hand, and our statutory mandate to protect the public interest and ensure that rates are just and reasonable and not unduly discriminatory or preferential, on the other, the "public interest" standard of review under the *Mobile-Sierra* doctrine cannot be "practically insurmountable" in all cases.

*Id.* (footnote omitted) (quoting *Papago*, 723 F.2d at 954). In other words, FERC took the position that the court's characterization of the standard in *Papago* did not "preclude[ ] the Commission from concluding in other circumstances that the interests of third parties sufficiently outweigh the contracting parties' interests in contract stability to justify the Commission's ordering contract modifications." *Id.* at 62,086. FERC distinguished *Papago* on the basis that "*Papago* expressly addressed rate changes, not the scope of

the Commission's authority upon its initial review of a newly-filed contract," *id.*, and declared that in situations where it is reviewing a fixed-rate agreement "for the first time, without having had any previous opportunity to determine whether its terms are lawful," a more relaxed public interest standard is warranted. *Id.* at 62,-087. The First Circuit affirmed. *See Northeast Utils. Serv. Co. v. FERC*, 55 F.3d 686, 692 (1st Cir.1995).

FERC, in two subsequent cases that PEPCO also relies on, reaffirmed its position in *Northeast Utilities*. In *Southern Company Services, Inc.*, 67 F.E.R.C. ¶ 61,-080 (1994), FERC reiterated that "the public interest standard of review does not bind the Commission to a practically insurmountable burden in all cases in which the Commission might act to change rates." *Id.* at 61,227. More specifically, FERC stated that the cases do not "impose a practically insurmountable burden when the Commission proceeds *sua sponte* or at the request of non-parties to change rates, terms and conditions in order to protect non-parties to a contract." *Id.* (citing *Northeast Utils.*, 66 F.E.R.C. at 62,081–88). Similarly, in *Florida Power & Light Co.*, 67 F.E.R.C. ¶ 61,141 (1994), FERC stated, "when we are acting *sua sponte* or at the request of non-parties to change rates, terms and conditions in order to protect non-parties, we are not bound to a standard of review that is practically insurmountable." *Id.* at 61,399.

Thus, as PEPCO contends, FERC has at times expressed an intent to apply a standard that is more flexible than the "practically insurmountable" standard that *Papago* described. However, unlike the circumstances in which FERC has stated it would apply a more flexible standard, PEPCO's § 206 request does not involve "the Commission proceed[ing] *sua sponte* or at the request of non-parties to change rates ... in order to protect non-parties to a contract." *Southern Co.*, 67 F.E.R.C. at 61,227; *see also Florida Power*, 67 F.E.R.C. at 61,399. PEPCO is not itself a

non-party. Nor did it offer any evidence (beyond speculation) that the only potential nonparties here, its ratepayers, were adversely affected by the existing rates; it did not, for example, even attempt to show how much if any of the rate disparity was passed on to PEPCO ratepayers rather than borne by the utility itself. Nor does PEPCO's request involve a "newly-filed or previously unreviewed agreement." *Northeast Utils.*, 66 F.E.R.C. at 62,087.[2] FERC was clear in *Northeast Utilities* that it was "not being asked to allow a party a unilateral rate change from a fixed-rate contract whose terms [it] previously accepted," and that it was instead "reviewing the ... [c]ontract for the first time, without having had any previous opportunity to determine whether its terms are lawful." *Id.* As FERC explained, applying the "practically insurmountable" standard in first review cases would mean that "[its] ability to protect the public interest would be negligible and public regulation would consist of little more than rubber-stamping private contracts." *Id.* By contrast, FERC had approved PEPCO's 1987 agreement with APS long before it was presented in 1998 with a complaint by one party to the agreement seeking a unilateral rate change. The concerns that FERC raised in *Northeast Utilities* with regard to applying the "practically insurmountable" public interest standard when reviewing a contract for the first time thus do not apply here.

■ The question remains whether FERC abused its discretion in concluding that PEPCO failed to meet its burden under the *Mobile-Sierra* public interest standard. PEPCO contends that FERC, in its public interest analysis, failed to consider the excessive burden on PEPCO's ratepayers and the discriminatory impact of the disparity between the transmission rates set by the 1987 agreement and APS's OATT transmission rate. The problem with PEPCO's position is that, other than pointing out that the contract rate is twice APS's OATT rate, it has presented no evidence regarding how the contract rates are unduly discriminatory or excessively burdensome on PEPCO ratepayers. The court has repeatedly emphasized the importance of contractual stability in a number of cases involving the *Mobile-Sierra* doctrine. *See, e.g., Maine Pub. Serv. Co. v. FERC*, 964 F.2d 5, 10 (D.C.Cir.1992); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1139 (D.C.Cir.1984); *Town of Norwood v. FERC*, 587 F.2d 1306, 1313 (D.C.Cir.1978). Furthermore, the court has consistently stated that rate disparity attributable to the operation of the *Mobile-Sierra* doctrine is not on that basis alone unduly discriminatory. *See Maine Pub. Serv.*, 964 F.2d at 10; *Cities of Bethany*, 727 F.2d at 1139, 1141; *Metropolitan Edison*, 595 F.2d at 857 n. 38; *Boroughs of Chambersburg v. FERC*, 580 F.2d 573, 577–78 (D.C.Cir. 1978). In addition, FERC precedent makes clear that the fact that a contract has become uneconomic to one of the parties does not necessarily render the contract contrary to the public interest. *See Soyland Power Coop., Inc. v. Central Illinois Pub. Serv. Co.*, 51 F.E.R.C. ¶ 61,004, at 61,013 (1990); *Public Service Co.*, 43 F.E.R.C. ¶ 61,469, at 62,152 (1988); *Gulf States Utils. Co. v. Southern Co. Servs., Inc.*, 43 F.E.R.C. ¶ 61,003, at 61,014 (1988). Considering such precedent in favor of protecting contractual stability, PEPCO's failure to provide any evidence of undue discrimination or excessive burden, other than the disparity in rates and a bald claim that PEPCO ratepayers would derive benefit from a rate modification, renders its request wholly inadequate. Therefore, FERC's summary dismissal of PEPCO's

---

2. This court has not had occasion to address, and need not do so here, whether FERC has authority to apply a *Mobile-Sierra* standard that is more flexible than the "practically insurmountable" standard whenever it reviews a "newly-filed or previously unreviewed agreement," *Northeast Utils,* 66 F.E.R.C. at 62,087, or "proceeds *sua sponte* or at the request of non-parties to change rates ... in order to protect non-parties to a contract." *Southern Co.,* 67 F.E.R.C. at 61,227; *see also Florida Power,* 67 F.E.R.C. at 61,399.

public interest argument was within its authority.

PEPCO also maintains that because of uneven bargaining power in 1987, it did not necessarily enter into the fixed-rate agreement with APS willingly. However, PEPCO's willingness was not part of FERC's rationale for dismissing the complaint. FERC pointed out in denying rehearing:

> The "premise" for the Commission's ruling is *not* that PEPCO willingly agreed to the Agreement's rates and terms. Rather, the "premise" for the Commission's ruling is that contract modification is not to be taken lightly and that, in this case, PEPCO has failed to demonstrate that a revision to the Agreement is in the public interest.

*PEPCO,* 87 F.E.R.C. at 61,106 (footnote omitted). Moreover, PEPCO can hardly escape the consequences of the fact that its statements to FERC in 1987 show that it fully supported the fixed-rate agreement, *see id.* at 61,106 n. 10, and that it has not alleged bad faith negotiation on the part of the parties to the agreement. Nothing in the record on appeal demonstrates that the contract was the result of APS's market power; to the contrary, PEPCO has admitted that it had other supply options when it entered the agreement with APS in 1987. *See Monongahela Power Co.,* 39 F.E.R.C. at 62,092. While the existence of other options does not necessarily mean an absence of market power, PEPCO's assertion to FERC in 1987 that the transmission agreement was cost–justified and represented cost savings over other supply options supports such a conclusion. Therefore, absent any claim, much less evidence, of unfairness or bad faith in the original negotiations, it is reasonable for FERC to require parties "to live with their bargains as time passes and various projections about the future are proved correct or incorrect." *Norwood,* 587 F.2d at 1312–13.

To the extent that PEPCO maintains that FERC's refusal to modify the contract is inconsistent with Order No. 888–A, it fares no better. In Order No. 888–A, FERC found that, prior to July 11, 1994, wholesale requirements contracts were "entered into during an era in which transmission providers exerted monopoly control over access to their transmission facilities," and that, as a result, "[m]any of these contracts were the result of uneven bargaining power." Order No. 888–A, FERC Stats. & Regs. ¶ 31,048, at 30,193 (1997). Accordingly, FERC concluded that it was in the public interest to permit those requirements customers to seek modification of their contracts under the just and reasonable standard, even if the contract contained a *Mobile-Sierra* provision. *See id.* at 30,189. However, as PEPCO concedes, Order No. 888–A's exception to application of the *Mobile-Sierra* standard plainly applies only to requirements contracts. Moreover, as PEPCO again concedes, for nonrequirements contracts, such as the APS agreement, FERC declined to extend its generic *Mobile-Sierra* findings to all long-term block purchases of electricity. *See id.* at 30,195. FERC distinguished these contracts from requirements contracts based on its conclusion that, in "the majority of circumstances, such long-term supply contracts are voluntary arrangements in which neither party had market power." *Id.* FERC noted, "[p]arties can avail themselves of the section 205 and 206 procedure already available if they want to seek modification of such contracts." *Id.* That is what PEPCO did here by requesting FERC to employ its § 206 authority, and FERC denied PEPCO's petition under the *Mobile-Sierra* doctrine. Therefore, FERC has precisely followed the procedure it outlined in Order No. 888–A.

It appears, then, that PEPCO's complaint is ultimately directed at FERC's application of the *Mobile-Sierra* doctrine. PEPCO maintains that APS had monopoly power at the time of the 1987 agreement and that FERC, "[h]aving expressly offered buyers ... the opportunity to make

section 206 filings to demonstrate that contracts that they previously had entered into were the subject of uneven bargaining power," has an obligation to take APS's monopoly power into account in its application of the *Mobile-Sierra* doctrine. PEPCO's contention amounts to a claim that FERC's decision to loosen the *Mobile-Sierra* standard for certain wholesale requirements contracts is equivalent to a commitment on FERC's part to conduct a case-by-case inquiry into the presence and extent of market power in every other non-requirement contract containing a *Mobile-Sierra* provision. However, Order No.888–A merely states that "[p]arties can avail themselves of the section 205 and 206 procedures ... if they want to seek modification," *id.*, and does not say anything one way or the other about the relevance of uneven bargaining power to the standard *Mobile-Sierra* analysis.[3] Besides, FERC's position in Order No. 888–A was a carefully considered balance between "the desire to honor existing contractual arrangements" and "the need to provide some means to accelerate the opportunity of parties to participate in competitive markets." *Id.* at 30,192. FERC continued, "To accomplish this balance, the Commission ... has made *Mobile-Sierra* public interest findings ... only as to a limited set of contracts: those wholesale requirements contracts executed on or before July 11, 1994. ..." *Id.* Therefore, any request for FERC to extend its Order No. 888–A exception for requirements contracts must be considered in light of the need for such a balance, and nothing in Order No. 888–A obliges FERC to strike the balance in the same way in all contexts. While PEPCO correctly points out that FERC's discussion of PEPCO's No. 888–A contention is terse, *see PEPCO,* 87 F.E.R.C. at 61,106 n. 11, and the relevance of uneven bargaining power to the *Mobile-Sierra* analysis remains unclear, PEPCO has failed to demonstrate that it was subject to APS's monopoly power at the time it entered into the 1987 agreement. Having presented no evidentiary detail that might have compelled FERC to consider whether, by analogy, it should extend its Order No. 888–A public interest findings on a case-by-case basis to non-requirements contracts possibly involving relevantly similar factual circumstances, PEPCO fails to show that FERC's summary dismissal was unreasonable.

Ultimately, PEPCO's case suffers from a failure of proof. PEPCO's counsel explained at oral argument that PEPCO did not seek a hearing before FERC on its § 206 complaint because PEPCO considered its allegations regarding the impact of the 1987 agreement on its ratepayers to be unrebutted. The court strains, in light of precedent, to imagine how PEPCO could conclude that it did not have a burden to offer evidence on this and other relevant factual issues, such as whether and the extent to which the agreement rates adversely impact PEPCO's ratepayers and whether APS had market power at the time the 1987 agreements were signed. PEPCO's position would undoubtedly have been strengthened had there been evidence in the record to support the assertions in its briefs regarding the asserted impact on ratepayers and APS's market power, although we express no opinion on the outcome under those circumstances.

3. In fact, at least one circuit court has expressed skepticism about the relevance of uneven bargaining power in *Mobile-Sierra* analysis. The First Circuit stated:
> As for the seller's market power, reliance on this factor threatens to erode the *Mobile-Sierra* doctrine so substantially that a fuller explanation from the Commission is required before proceeding down this route. After all, some measure of market power could be present in a large number of contracts. A case-by-case inquiry into the presence and extent of market power would inject a new and potentially time-consuming element into the *Mobile-Sierra* analysis, and it is not entirely clear in any event why the Commission should protect a buyer who voluntarily enters into an agreement with a dominant seller.

*Northeast Utils. Serv. Co. v. FERC,* 993 F.2d 937, 961 (1st Cir.1993).

In sum, given the practically insurmountable standard that it faced, PEPCO was obligated to do more than point to the disparity between the agreement rates and the rates it would pay under the APS open access tariff. FERC reasonably concluded that PEPCO failed to demonstrate that the APS rates in the 1987 agreement are contrary to the public interest. While FERC retains the statutory authority and duty to correct or prevent an electric rate schedule that " 'might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory,' " *Papago* 723 F.2d at 953 (quoting *Sierra,* 350 U.S. at 355, 76 S.Ct. 368), it acted within its discretion to conclude from the face of the complaint that the rates in the previously approved agreement that PEPCO fully supported and claimed was justified were not contrary to the public interest. Accordingly, we deny the petition.