Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 21, 2006          Decided June 30, 2006

No. 05-1001

MAINE PUBLIC UTILITIES COMMISSION, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MASSACHUSETTS MUNICIPAL WHOLESALE
ELECTRIC COMPANY, ET AL.,
INTERVENORS

———

Consolidated with
No. 05-1002

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Charles G. Cole* argued the cause for Transmission Owner Petitioners and supporting intervenors.  With him on the briefs

were *David B. Raskin*, *Alice E. Loughran*, *Kenneth G. Jaffe, Elias G. Farrah*, *Mary E. Grover*, *Thomas N. Wies*, *G. Philip Nowak*, *Michael E. Small*, *Sonia C. Mendonca*, and *Mary A. Murphy*. *Michael F. McBride*, *Wendy N. Reed*, and *Stephen L. Teichler* entered appearances.

*Harvey L. Reiter* argued the cause for State Commission Petitioners and supporting intervenors. With him on the briefs were *Lucy Holmes Plovnick*, *John P. Coyle*, *Scott H. Strauss*, and *Randall L. Speck*. *Dennis Lane*, *Allan B. Taylor*, and *Michael P. Shea* entered appearances.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *John S. Moot*, General Counsel, and *Judith A. Albert*, Attorney.

*David B. Raskin*, *Charles G. Cole*, *Alice E. Loughran*, *Kenneth G. Jaffe, Elias G. Farrah*, *Mary E. Grover*, *Thomas N. Wies*, *G. Philip Nowak*, *Michael E. Small*, *Sonia C. Mendonca*, and *Mary A. Murphy* were on the brief for intervenors Transmission Owners in support of respondent on Retention of Return of Equity Adder. *Wendy N. Reed* entered an appearance.

*Harvey L. Reiter*, *Lucy Holmes Plovnick*, *John P. Coyle*, *Scott H. Strauss*, and *Randall L. Speck* were on the brief for intervenors in support of FERC on Elimination of ROE Adder and RTO Termination Provisions. *John E. McCaffrey* entered an appearance.

Before: GINSBURG, *Chief Judge*, and ROGERS and GARLAND, *Circuit Judges*.

ROGERS, *Circuit Judge*: In these consolidated cases[1], owners of electric transmission facilities and several state public utility commissions petition for review of orders of the Federal Energy Regulatory Commission conditionally approving a proposal to form a regional transmission organization in New England ("RTO-NE"). The transmission owner members ("TOs") challenge FERC's authority to reject the provision of their Transmission Operating Agreement providing that FERC review withdrawals from the RTO under *Mobile-Sierra*'s public interest standard.[2] The TOs also contend that FERC's rejection of this provision, and its rejection of an incentive adjustment to the TOs' return on equity ("ROE") for local transmission service, were arbitrary and capricious. The State Commissions maintain that FERC's approval of a 50 basis point incentive adjustment to the TOs' ROE for regional transmission was arbitrary and capricious.

RTOs are a creation of FERC's, and FERC has broad authority over the decision to approve a RTO. A proposal to establish a RTO is essentially a proposal to change the rates on file; as such, FERC had authority under Section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d (2000), to modify

---

[1] Petitioners in No. 05-1002 are Northeast Utilities Service Company, Bangor-Hydro Electric Company, Central Maine Power Company, NSTAR Electric & Gas Corporation, New England Power Company, The United Illuminating Company, and Vermont Electric Power Company. Petitioners in No. 05-1001, who were intervenors before FERC, are The Maine Public Utilities Commission, New England Conference of Public Utilities Commissioners, and the Vermont Department of Public Service ("State Commissions").

[2] The "*Mobile-Sierra* doctrine" is derived from the Supreme Court's companion cases*, United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956), and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

the operating agreement as a condition of approving the RTO. Further, in light of concerns about the effects on market participants and the electricity market, FERC was not arbitrary and capricious in requiring the "just and reasonable" standard of review for withdrawals from the RTO. Finally, consistent with the court's deferential review under § 205 of the FPA of FERC's determinations regarding rate design, FERC's ROE incentive adjustments were not arbitrary and capricious. Accordingly, we deny the petitions for review.

## I.

In Order 2000, FERC required all public utilities that own, operate, or control interstate transmission facilities either to file a proposal to participate in a RTO or to describe their efforts toward joining one. *See Regional Transmission Organizations*, F.E.R.C. Stats. & Regs. ¶ 31,089 (1999), 65 Fed. Reg. 810 (2000) ("Order 2000"), *clarified on reh'g*, F.E.R.C. Stats. & Regs. ¶ 31,092, 65 Fed. Reg. 12,088 (2000) (*"Order 2000-A"*) (codified at 18 C.F.R. § 35.34 (2006)), *petitions for review dismissed sub nom. Pub. Util. Dist. No. 1 of Snohomish County, Washington v. FERC*, 272 F.3d 607, 614 (D.C. Cir. 2001) ("*Snohomish County*"). FERC conceived of the RTOs as mechanisms for providing large and stable transmission systems that would reduce regional pricing disparities and create an efficient market for new power generators. *See* Order 2000, F.E.R.C. Stats. & Regs. ¶ 31,089, at 30,933; Order 2000-A, F.E.R.C. Stats. & Regs. ¶ 31,092, at 31,355; *see also Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1006-07 (D.C. Cir. 2005). By combining various utilities' segmented transmission facilities into a regional transmission grid under the control of one independent entity, FERC anticipated that RTOs would eliminate certain transmission inefficiencies and opportunities for discrimination that hindered the formation of competitive wholesale electric energy markets and that these new structures

would therefore result in significant benefits to the public. *See Snohomish County*, 272 F.3d at 610-12.

By 2003, however, FERC had fully approved only two RTOs. *See Proposed Pricing Policy for Efficient Operation and Expansion of Transmission Grid*, 102 F.E.R.C. ¶ 61,032, at 61,062 (2003) ("*Pricing Policy*"). To encourage timely formation of RTOs, FERC proposed a 50 basis point incentive adjustment ("adder") to the ROEs for TOs participating in a FERC-approved RTO, and established the deadline of December 31, 2004 for qualifying for the proposed incentives. *Id.* at 61,065-66.

On October 31, 2003, an independent system operator ("ISO"), ISO-New England, and a group of TOs submitted for FERC approval, under Section 205 of the FPA, a proposal to establish RTO-NE. Under the TOs' Transmission Operating Agreement ("TOA"), the TOs would transfer operational authority over their transmission facilities to the RTO, subject to certain reserved rights. Section 10.01 of the TOA set the terms and conditions for members' withdrawal from RTO participation and termination of the RTO, providing in subpart (f) that withdrawal "shall be effective unless the FERC finds that such . . . withdrawal is contrary to the public interest under the public interest standard of review as set forth" in the *Mobile-Sierra* doctrine, *supra* note 2. In a related filing, on November 4, 2003, the TOs requested approval of a ROE recoverable under the regional and local transmission rates charged by RTO-NE. The ROE would consist of a base ROE of 12.8 percent, an additional 50 basis points for participation in the RTO (and an additional 100 basis points to reward future expansion by the New England TOs, which is not at issue). The TOs sought the 50 basis point adder "to reward their willingness to transfer operational control authority over their transmission facilities to RTO-NE," and noted that FERC's proposed *Pricing Policy*

stated:

> any entity that transfers operational control of transmission facilities to a [FERC]-approved RTO would qualify for an incentive adder of 50 basis points on its ROE for all such facilities transferred.

*Pricing Policy*, 102 F.E.R.C. at 61,061.

FERC conditionally approved the RTO-NE by Order of March 24, 2004. *See ISO New England Inc., Order Granting RTO Status Subject to Fulfillment of Requirements and Establishing Hearing and Settlement Judge Procedures*, 106 F.E.R.C. ¶ 61,280 (2004) ("*Approval Order*"). The petitioners challenge three determinations FERC made in the *Approval Order*: First, FERC rejected the TOs' proposal that the *Mobile-Sierra* "public interest" standard govern FERC review of termination and withdrawal from RTO-NE and ordered that the TOA be modified to set the "just and reasonable" standard for such review in accordance with Section 205 of the FPA and FERC's published guidance. *See Guidance on Regional Transmission Organization and Independent System Operator Filing Requirements Under the Federal Power Act*, 104 F.E.R.C. ¶ 61,248, at 61,825 (2003) ("*Guidance*"). FERC explained that the "public interest" standard "would prohibit any meaningful review . . . under Section 205 . . . even in those instances where revisions to RTO-NE's operating agreements may be necessary or appropriate as a result." *Approval Order*, 106 F.E.R.C. at 62,030 (para. 59). Second, FERC summarily approved, without suspension or hearing, the 50 basis point ROE adder for regional transmission service, agreeing with the TOs that their voluntary entry into RTO-NE and their commitment to transfer day-to-day operational control to the RTO warranted the ROE adder. *Id.* at 62,056. FERC explained that the adder was consistent with its rulings in other cases and appropriate here

"because of the region-wide benefits that w[ould] be set in place . . . ." *Id*. (para. 245). Third, FERC rejected the TOs' proposed 50 basis point adder for local network service transmission not controlled by the RTO on the ground that it was beyond the scope of the incentive. *Id.* The TOs were directed to make a compliance filing within 90 days. *Id.* at 62,057. Upon various intervenors' requests for rehearing or clarification of the *Approval Order*, FERC reaffirmed its determinations by Order of November 3, 2004. *ISO New England, Inc., Order Accepting Partial Settlement, Subject to Conditions; Accepting, in Part, Compliance Filings; and Granting, in Part, and Denying, in Part, Requests for Rehearing*, 109 F.E.R.C. ¶ 61,147 (2004) ("*Rehearing Order*"). These petitions for review followed.

## II.

The TOs challenge FERC's modification of the termination provision of the TOA on the ground that FERC violated the *Mobile-Sierra* doctrine by rejecting the "public interest" standard agreed to by the parties and ordering that termination and withdrawals be subject to the "just and reasonable" standard, which would grant FERC more searching review. The TOs maintain that just as they have the statutory right under Section 205 of the FPA to set rates and the right to enter into RTO contracts waiving some of those rights, they also have the right to set rate-related terms, including the length of their service agreements.

"To determine whether the agency's action is contrary to law, we look first to determine whether Congress has delegated to the agency the legal authority to take the action that is under dispute." *Michigan v. EPA*, 268 F.3d 1075, 1081-82 (D.C. Cir. 2001) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-28 (2001)); *cf. Chevron USA, Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984). The court applies the traditional tools

of statutory interpretation in determining congressional intent, looking to the text, structure, purpose, and legislative history of a statute. *See Chevron*, 467 U.S. at 842-43 & n.9.

Under Section 201(b) of the FPA, Congress has vested FERC with jurisdiction over "all rates, terms, and conditions of electric transmission service provided by public utilities in interstate commerce, as well as over the sale of electric energy at wholesale." *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 4 (D.C. Cir. 2002); 16 U.S.C. § 824(b). Section 205, in turn, provides that the rates, terms, and conditions of electrical transmission service subject to FERC jurisdiction "shall be just and reasonable, and any such rate or charge that is not just and reasonable is . . . unlawful" and bars utilities from exercising "undue preference" or "undue prejudice" in the rates charged. 16 U.S.C. § 824d(a) & (b). A public utility may file changes to rates, charges, classification, or service at any time after providing 60 days' public notice. *Id.* § 824d(d). These changes go into effect immediately. *Cities of Campbell v. FERC*, 770 F.2d 1180, 1184-85 (D.C. Cir. 1985); *Papago Tribal Util. Auth. v. FERC*, 723 F.2d 950, 952-53 (D.C. Cir. 1983). FERC, however, can conduct a hearing under Section 205 to review any rate changes and suspend them for a period of five months, but it may reject them only upon finding that the proposed rate changes fail to meet the standards of Section 205, with the utility bearing the burden of demonstrating that the proposed changes are "just and reasonable," 16 U.S.C. § 824d(a), and non-preferential, *id.* at 824d(b); *cf. Tenn. Gas Pipeline Co. v. FERC*, 860 F.2d 446, 449 (D.C. Cir. 1988). In addition, under Section 206, FERC "itself may initiate rate changes . . . but only upon finding that the existing rates are unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a); *see Cities of Campbell*, 770 F.2d at 1185; *Papago Tribal Util.*, 723 F.2d at 952.

Under the *Mobile-Sierra* doctrine, however, "utilities may choose to voluntarily give up, by contract, some of their rate-filing freedom under section 205." *Atlantic City,* 295 F.3d at 10-11. Thus, a utility may negotiate a transmission contract with a provision relinquishing its right to file for a unilateral change in rates. *See id.* at 11; *Papago Tribal Util.*, 723 F.2d at 953. Similarly, "by broad waiver, the parties [to a jurisdictional contract] may eliminate . . . [FERC]'s power to impose changes under § 206, except the indefeasible right of [FERC] under § 206 to replace rates that are contrary to the public interest." *Papago Tribal Util.*, 723 F.2d at 953. Such fixed-rate contracts are not subject to unilateral amendment by a party to the contract, and once accepted for filing, FERC may subsequently order modification only upon finding that the modification is required by the "public interest,*" see Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 406 (D.C. Cir. 2000), and upon a showing that the changes are just, reasonable, and nondiscriminatory, *see Atlantic City*, 295 F.3d at 10 (citing *Tenn. Gas*, 860 F.2d at 454). The "public interest" standard was described in *Federal Power Commission v. Sierra Pacific Power Co.* as requiring modification of previously approved contracts in instances "where [the existing rate structure] might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Sierra*, 350 U.S. at 355; *see Atlantic City,* 295 F.3d at 14.

As a threshold matter, and contrary to the TOs' position, it is not clear that *Mobile-Sierra* has any relevance to FERC's initial review of a contract to establish a RTO. As FERC points out, this court has only had occasion to apply the *Mobile-Sierra* public interest standard to FERC-approved contracts rather than those submitted to FERC for initial approval. *See, e.g.*, *Potomac Elec. Power Co.*, 210 F.3d at 409. This interpretation is consistent with *Mobile-Sierra*'s recognized purpose of ensuring

contract stability by "subordinat[ing] the statutory filing mechanism to the broad and familiar dictates of contract law." *Borough of Lansdale v. FPC*, 494 F.2d 1104, 1113 (D.C. Cir. 1974); *see Potomac Elec. Power Co.*, 210 F.3d at 408; *see also ANR Pipeline Co. v. FERC*, 771 F.2d 507, 519 (D.C. Cir. 1985). Indeed, the TOs recognize that the TOA effects changes in existing transmission service contracts and is thus subject to FERC approval under Section 205. Thus, given that RTOs are FERC's creation, FERC has substantial leeway in deciding the conditions under which it will approve a proposal to establish a RTO. This circumstance -- in which a proposal for an RTO has not yet received initial approval -- is distinguishable from other situations in which parties have entered into a fixed-rate contract and FERC "must summarily reject rate filings inconsistent with the outstanding fixed rate contract whether or not the contracts have been filed with the [FERC]." *Borough of Lansdale*, 494 F.2d at 1114.

Again, "the purpose of the *Mobile-Sierra* doctrine is to preserve the benefits of the parties' bargain as reflected in the contract, assuming that there was no reason to question what transpired at the contact formation stage." *Atlantic City*, 295 F.3d at 14 (citing *Town of Norwood v. FERC*, 587 F.2d, 1306, 1312 (D.C. Cir. 1978)). FERC points out that there is no expectation of contract stability when a contract is submitted to FERC for the first time, has yet to be approved by FERC, and has not yet gone into effect -- particularly when that contract is a complex agreement establishing a new regional structure impacting all market participants. [Red 23] This hardly seems the situation *Mobile-Sierra* was designed to guard against, viz., where one party to a rate contract on file with FERC attempts to effect a unilateral rate change by asking FERC to relieve its obligations under a contract whose terms are no longer favorable to that party. *See Sierra*, 350 U.S. at 355; *see generally* David G. Tewksbury & Stephanie S. Lim, *Applying the Mobile-Sierra*

*Doctrine to Market-Based Rate Contracts*, 26 Energy L.J. 437, 439-47 (2005). Absent a pre-existing FERC-approved RTO operating agreement, the TOs fail to explain why FERC would be obligated, under either the FPA or the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (2000), to approve all of the terms of the TOA, which is submitted as part of the RTO-NE proposal.

The TOs rely upon two cases to support their contention that FERC exceeded its authority in ordering the modification to the TOA; both cases are readily distinguishable. In *Atlantic City*, 295 F.3d at 3-4, public utilities sought review of FERC orders approving their ISO agreement on the condition that the utilities modify their agreement so as to relinquish the right, under Section 205, to file changes in tariff rates, terms, and conditions, and to prohibit members from withdrawing from the ISO without FERC approval under Section 203, 16 U.S.C. § 824b(a).[3] The court held that FERC had exceeded its authority when it required the utilities to cede their Section 205 right to file rate changes and that FERC's expansive reading of its Section 203 jurisdiction could not be reconciled with Section 202, 16 U.S.C. § 824a, which leaves coordination and interconnection arrangements to the voluntary action of the utilities. *See Atlantic City*, 295 F.3d at 11-12.

The TOs seek to have the court apply *Atlantic City's* holding to what they claim is their right under Section 205 to set the terms of the length of their RTO service agreement,

---

[3] Section 203 now provides, in relevant part, that "[n]o public utility shall, without first having secured an order of [FERC] authorizing it to do so -- (A) sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the [FERC], or any part thereof of a value in excess of $10,000,000." 16 U.S.C.A. § 824b(a)(1) (West Supp. 2006).

maintaining that, although FERC could have determined that the TOA was contrary to the "public interest," in the absence of such a finding, FERC lacks the authority to modify a negotiated contract to insert a different standard. However, the issue in *Atlantic City* was limited to the question of whether FERC had jurisdiction under either Sections 203 or 205 to oblige public utilities to cede their rights to make future filings under Section 205. *Id.* at 11. The court noted that the parties did not dispute FERC's authority to review their agreement at the outset, or to decide, based on evidence in the record, whether the entry and exit rights specified therein were just and reasonable within the meaning of Section 205. *Id.* at 12.

In essence, the TOs contend that they have a right to contract for *Mobile-Sierra* protections with respect to a future unilateral decision to change an existing transmission service agreement — i.e., the decision to withdraw from RTO-NE — and that FERC may not abrogate this right by requiring, in its initial review of the contract under Section 205, that a provision be struck that purportedly protects the withdrawal decision from FERC review under the standards in Sections 205 and 206. Although the court acknowledged in *Atlantic City* that the right to set rates in the first instance is a statutory right of utilities, 295 F.3d at 10, and that Section 205 does not authorize FERC to require a utility to cede the right to initially set such rates, *id.* at 11, there is no indication in the statute or in *Atlantic City* that Sections 202(a)[4] [Blue 23; Gray 6] or 205 must be interpreted to

---

[4] Section 202(a) provides, in relevant part, that:

> For the purpose of assuring an abundant supply of electric energy throughout the United States . . . [FERC] is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the

grant utilities the unilateral right in proposing a RTO to avoid the levels of review provided by the statute and the terms of FERC's published Guidance.  To the extent that the FPA does not expressly address this question, FERC's interpretation of its authority under Section 205 is permissible and therefore entitled to deference by the court under step two of the *Chevron* analysis.  *See Chevron*, 467 U.S. at 843; *see Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000); *Pub. Serv. Co. of Colo. v. FERC*, 91 F.3d 1478, 1482-86 (D.C. Cir. 1996).  After all, the "right" provided by Subsection 10.01(f) of the TOA — that unilateral withdrawal shall be "effective unless the FERC finds that such . . . withdrawal is contrary to the public interest " — is not a right one signatory has against another; it is not, as TOs suggest, a mere "term" of the transmission agreement in the sense of the length of time that the agreement will be in effect.  Instead, it is an attempt to limit the statutory authority of FERC, a non-signatory to the agreement, which FERC has not yet approved and accepted for filing.  Absent FERC's approval of RTO-NE and the terms of the TOA, this provision cannot alter the statutory status quo ante.

In *Northeast Utilities Service Co. v. FERC*, the other case on which the TOs rely, FERC conditionally approved the merger of a public utility pursuant to Section 203 and reviewed its associated initial rate filings under Section 205.  993 F.2d 937, 943 (1st Cir. 1993); *see Northeast Utils. Serv. Co.*, 56 F.E.R.C.

---

generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest.

16 U.S.C. § 824a(a).

¶ 61,269, at 61,987 (1991), *order on remand*, 66 F.E.R.C. ¶ 61,332, at 62,087 (1994). On appeal, the First Circuit considered whether FERC had the authority in its initial review of the filings to deny a utility the future protections of *Mobile-Sierra* with respect to four rate schedules. In that case, the parties sought to protect their rate schedules from amendment by FERC except under circumstances that satisfied the stringent "public interest" criteria.[5] FERC had ordered language to be struck that restricted subsequent FERC review of the contracts to the *Mobile-Sierra* public interest standard. *Northeast Utils.*, 993 F.3d at 960. The First Circuit concluded that, by refusing to allow negotiated rate schedules to be subsequently reviewed under the public interest standard, FERC had unlawfully circumvented the *Mobile-Sierra* doctrine. *Id.* at 960-61 (citing *Papago Tribal Util.*, 723 F.2d at 953-54).

However, the First Circuit was not confronted with a contract provision that would insulate a future and not-yet reviewed rate change from scrutiny under Section 205; the merger-related rate schedules sought to limit subsequent review of the rates, which had been filed and would be effective

---

[5] One of the agreements provided:

> Further, [contracting parties] shall not, and each hereby waives (to the extent it may lawfully do so) any right it may have to, file a complaint with respect to the rates charged under this Agreement pursuant to Section 206 of the Federal Power Act . . . without the prior written consent of each of the others, and each further agrees that in any proceeding by the FERC under Section 206 the FERC shall not change the rate charged under this Agreement unless such rate is found to be contrary to the public interest.

*Ne. Utils. Serv. Co.*, 50 F.E.R.C. ¶ 61,266, at 61,838.

subsequent to the bankruptcy reorganization of what had been the largest utility in New Hampshire. *See Northeast Utils. Serv. Co.*, 50 F.E.R.C. ¶ 61,266, at 61,821-23, *reh'g granted in part and denied in part*, 51 F.E.R.C. ¶ 61,177 (1990), *order on remand*, 66 F.E.R.C. ¶ 61,332, at 62,092-93 (1994). The court stated that "[u]nder the *Mobile-Sierra* doctrine, [FERC] must respect *certain* private contract rights," *Northeast Utilities*, 993 F.2d at 960 (emphasis added), citing and quoting *Papago Tribal Utility Authority*, 723 F.2d at 953), to which we alluded earlier in this opinion. These circumstances are distinguishable from FERC's initial review, under Section 205, of a TOA that is part of a proposal to establish a RTO. To the extent that *Northeast Utilities*, 993 F.2d at 960-61, and its companion, *Northeast Utilities Service Co. v. FERC*, 55 F.3d 686, 689-90 (1st Cir. 1995), might be interpreted to suggest that parties may, by mutual agreement, limit FERC's authority under Section 205 over initial review of a rate change, *cf. Northeast Utils. Serv. Co.*, 66 F.E.R.C. ¶ at 62,081, this suggestion is belied by the First Circuit's invocation of Section 206, not Section 205, as the provision which is the subject of its analysis. *See Northeast Utils.*, 993 F.2d at 961-62; *Northeast Utils.*, 55 F.3d at 687.

The TOs' next challenge to FERC's modification of the TOA's withdrawal provision as arbitrary and capricious — on the ground that the modification is inconsistent with the voluntary nature of RTO participation recognized in Order 2000 — fares no better. Our review of FERC orders under the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), is "highly deferential" to the agency, *Sithe/Independence Power Partners v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999); the court must affirm such orders unless the agency failed to consider relevant factors or made a "clear error of judgment," *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16, 416 (1971).

On rehearing, FERC made clear that the TOs' ability to withdraw from the RTO without Section 205 "just and reasonable" review could "have a substantial [deleterious] impact on other market participants and the markets themselves." *Rehearing Order*, 109 F.E.R.C. at 61,576 (para. 41). Intervenors argued before the agency that by giving the TOs a unilateral right of withdrawal, the TOA gave the TOs too much leverage over day-to-day operations. FERC had initially explained that the proposed withdrawal arrangement could subvert the independence of the RTO, contrary to the principles for RTOs set forth in Order 2000. *See Approval Order*, 106 F.E.R.C. at 62,028, 62,030 (paras. 47, 59). On rehearing, FERC further explained "full, meaningful review . . . would not be possible . . . governed by a standard of review," such as the "public interest" standard, which "limits the application of the just and reasonable standard." *Rehearing Order*, 109 F.E.R.C. at 61,576 (para. 40). FERC foresaw that a TO's withdrawal from an RTO "can have a substantial impact on other market participants and the markets themselves." *Id.* (paras. 40-41). Given that FERC anticipates that RTOs will encourage entry into the market, and that entrants have and will rely upon a transmission grid controlled by an independent entity, ensuring meaningful FERC review of changes regarding control of the grid is a reasonable accommodation between FERC's responsibility to protect the public and the utilities' contractual rights to arrange their affairs. *See id.* at 61,581 (para. 73).

The TOs offer no persuasive response to either of FERC's concerns about market impact. Although they emphasize that, under Order 2000, RTO formation was to be voluntary,[6] [Blue I at 30] there is nothing inconsistent with the TOs' voluntary

---

[6] *See generally* Order 2000, FERC Stats. & Regs ¶ 31,089, *on reh'g*, Order 2000-A, FERC Stats. & Regs. ¶ 31,092; *see also Snohomish County*, 272 F.3d at 613-17.

decision to organize themselves into RTO-NE, and FERC's insistence on compliance with its announced RTO terms and conditions. *See Approval Order*, 106 F.E.R.C. at 62,030 (para. 59). As intervenors observe, the TOs were not required to proceed with RTO-NE if they found the termination condition unacceptable. Moreover, having received the benefits of RTO status, including the 50 basis point adder to ROE, the TOs can hardly demonstrate that it is reasonable to permit withdrawals without FERC's first considering the impact on the criteria in Order 2000. To the extent the TOs contend that, even if FERC has authority to order the modification of the TOA, FERC failed to make the necessary findings under Section 206, namely that the proposed termination provision was "unjust and unreasonable," *cf. W. Res., Inc. v. FERC*, 9 F.3d 1568, 1574-76 (D.C. 1993); *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 184 (D.C. Cir. 1986), the court lacks jurisdiction to decide this issue because it was not raised before FERC, *see* FPA § 313(b), 16 U.S.C. § 825l(b); *DTE Energy Co. v. FERC*, 394 F.3d 954, 955-56 (D.C. Cir. 2005).

## III.

FERC's determinations on the ROE adders involve matters of rate design, which are technical and involve policy judgments at the core of FERC's regulatory responsibilities. Hence, the court's review of whether a particular rate design is just and reasonable is highly deferential. *See N. States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994); *Town of Norwood*, 962 F.2d at 22.

The State Commissions challenge FERC's approval of the 50 basis point incentive adder for regional service, which FERC determined to be "just and reasonable." The State Commissions contend that: (1) the adder pretends to offer incentives for transmission restructuring that has already occurred; (2) FERC

failed to calibrate its use of non-cost-based rate elements to ensure that the resulting increases in rates would be no more than is necessary to create such purported incentive for RTO formation; (3) FERC's determination is inconsistent with its conclusion, in a factually-similar case involving a restructured power pool, that such an adder would not motivate RTO formation; and (4) FERC's three rationalizations for the adder fail because they are inaccurate, conclusory, and ignore the need to avoid creating windfalls for public utilities.

FERC's findings refute the State Commission's first objection. FERC found that ISO-NE's full independence was "limited by its contractual arrangement with NEPOOL," whereby "market participants, not ISO-NE, have the primary authority to establish and revise rates, terms, and conditions governing the operation of the New England wholesale electricity market." *Approval Order*, 106 F.E.R.C. at 62,029 (para. 52)] FERC had previously found that this governance model could not meet FERC's independence requirement under Order 2000 unless the market participant committees within NEPOOL were advisory. *See Bangor Hydro-Electric Co.*, 96 F.E.R.C. ¶ 61,063, at 61,259 (2001). By contrast, FERC found that the RTO-NE proposal meets the independence requirements by calling for a governance structure designating authority over the operation of New England markets "squarely in the hands of a financially disinterested entity rather than with market participants." *Approval Order*, 106 F.E.R.C. at 62,029 (para. 53). In addition, the five-year term with automatic renewal of the TOA would contribute to greater institutional stability and independence than ISO-NE's day-to-day operations under interim contracts. Moreover, FERC points out, because "the adder rewards the [TOs] for their future participation, as well as for their initial surrender of control over their facilities," Respondent's Br. at 35, FERC reasonably concluded the adder does not only reward past action. The same could not be said in

the cases on which the State Commissions rely. *See, e.g., Allegheny Power Sys. Operating Cos.*, 111 F.E.R.C. ¶ 61,308, 2005 WL 1301759, \*\*14 (2005) (para. 54).

Second, FERC did the necessary calibration, determining the 50 basis point adder to be within the zone of reasonableness. *See Approval Order*, 106 F.E.R.C. at 62,056 (para. 246); *Rehearing Order*, 109 F.E.R.C. at 61,600. FERC explained that it had ensured that the ROE would result in reasonable rates by making them

> subject to a cap on the overall ROE . . . equal to the top of the range of reasonable ROEs for a proxy group consisting of the investor-owned transmission owners participating in the relevant RTO whose shares are publicly traded.

*Pricing Policy*, 102 F.E.R.C. at 61,067 (para. 37). To the extent that the State Commissions consider this to be a meaningless standard, they ignore the cap, as is evidenced by the cases on which they rely. *See City of San Antonio v. ICC*, 631 F.2d 831, 852-53 (D.C. Cir. 1980); *Sys. Fuels, Inc. v. ICC*, 642 F.2d 112, 116 (5th Cir. 1981). Particularly in view of FERC's authority to consider non-cost factors in setting rates, *see Permian Basin Area Rate Cases*, 390 U.S. 747, 791-92, 815 (1968); *Pub. Utils. Comm'n of Cal. v. FERC*, 367 F.3d 925, 929 (D.C. Cir. 2004), the State Commissions' position on calibration demands too much, *cf. Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1501-02 (D.C. Cir. 1984). Here, FERC was applying policy considerations to choose from among several "cost-recovering rate[s]." *FPC v. Conway Corp.*, 426 U.S. 271, 278 (1976). Because a ROE is "not susceptible to a precise calculation," *Rehearing Order*, 109 F.E.R.C. at 61,600 (para. 207), and "is based, rather, on a range of reasonable returns, which take into account a number of factors that may be both

cost-related and policy-related, including business risk factors," *id*., courts have recognized that there is a zone of reasonable ROEs and have held FERC to an end-result test. *See Permian Basin*, 390 U.S. at 797; *Pub. Serv. Comm'n of Ky.*, 397 F.3d at 1009. FERC points out that there is not a sufficiently long track record with which to measure the full value of the benefits of RTOs on market performance. *Cf. Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1371 (D.C. Cir. 2004). In FERC's words on rehearing: in the RTO context, "it is appropriate . . . to adjust the allowed return for [TOs] that undertake commitments designed to enhance the overall competitiveness and efficiency of the wholesale markets, so long as the resulting rate of return is within the range of reasonable returns." *Rehearing Order*, 109 F.E.R.C. at 61,600 (para. 207). Given the expertise implicated in FERC's determination, and the measures it took to explain and cabin the adder, the court can conclude that the determination meets this minimum standard for reasonableness. *See Midwest ISO Transmission Owners*, 373 F.3d at 1371.

Third, approval of the 50 point adder is consistent with FERC precedent, *see, e.g.*, *PJM Interconnection LLC*, 104 F.E.R.C. ¶ 61,124, at 61,435 (2003), and FERC's *Pricing Policy*, 102 F.E.R.C. at 61,065. The State Commissions point to *Allegheny Power System Operating Cos.*, 111 F.E.R.C. ¶ 61,308, 2005 WL 1301759, **14, to support the obvious proposition that FERC will not, and cannot, create incentives to motivate conduct that has already occurred. In *Allegheny* certain transmission-owning members of a RTO requested an incentive adder for RTO membership nearly two years after they had joined the approved RTO. *See id.* at **13-14. Here, the RTO has yet to be approved and the adder does not reward only past conduct; therefore, the case is inapposite.

In light of FERC's findings, which are supported by

substantial evidence, *see* 16 U.S.C. § 8251(b), FERC reasonably could conclude, as it did, that the transformation from an ISO to a RTO would impose significant obligations on member TOs. For the first time, an independent entity would control the open access transmission tariff and other terms governing the market with resulting significant benefit to the public.

The State Commissions' other challenges are unpersuasive. The objection that generic policies do not justify imposing the adder because generalized policy statements (let alone proposed policy) cannot justify agency action, *see Pac. Gas & Elec. v. FPC*, 506 F.2d 33, 38-39 (1974)*; Pub. Serv. Comm'n of Ky.,* 397 F.3d at 1012, misses the mark. In *Public Service Commission of Kentucky*, the court did not indicate that allowing adders to a ROE was outside of the ambit of FERC's ratemaking authority under Section 205; rather, the court held that notice to interested parties that adders were being considered was required prior to FERC's acceptance of them, *see* 397 F.3d at 1012. Congress has since enacted the Energy Policy Act of 2005, albeit after FERC issued the orders challenged here, which authorizes FERC to "provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization." Pub. L. No. 109-58, § 1241(c), 119 Stat. 594 (2005) (codified at 16 U.S.C.A. § 824s(c) (West Supp. 2006)). The objection that, even if the adder power now falls within FERC's authority, 16 U.S.C.A. § 824s(c), this does not relieve FERC's obligation to determine if a non-cost based component was reasonable, overlooks FERC's explanations in the *Rehearing Order* that a ROE is not susceptible to a precise calculation, 109 F.E.R.C. at 61,600. The objection also overlooks FERC's explanations in the *Approval Order* that the 50 point basis adder falls within a zone of reasonableness, 106 F.E.R.C. at 62,056 (para. 246) and that pre-existing regional arrangements by ROE filers failed to meet the independence requirements of Order 2000, *id.* (para. 245).

Finally, contrary to the TOs' contention, FERC's rejection of the adder for local rates was not arbitrary. Aware of the long-standing practice in New England of distinguishing between facilities providing regional services from those providing local services, *see Approval Order*, 106 F.E.R.C. at 62,022 n.11, FERC explained that the purpose of the 50 basis point adder was to encourage utilities to cede control of regional facilities to an independent entity responsible for providing regional transmission service under the terms and conditions of a regional tariff, *see Rehearing Order*, 109 F.E.R.C. at 61,599 (para. 201). By contrast, the TOs retained significant control of local service, which operated under individual tariffs. Hence, FERC reasonably concluded that there was nothing to reward.

Accordingly, we deny the petitions for review.