# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued September 9, 2005　　　　Decided November 1, 2005

No. 04-1171

SACRAMENTO MUNICIPAL UTILITY DISTRICT,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MODESTO IRRIGATION DISTRICT, ET AL.,
INTERVENORS

―――――

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

―――――

*Harvey L. Reiter* argued the cause for petitioner. With him
on the briefs were *Glen L. Ortman*, *Adrienne E. Clair*, *John E.
McCaffrey*, and *Lucy Holmes Plovnick*.

*Bill Lockyer*, Attorney General, Attorney General's Office
of the State of California, *Mary E. Hackenbracht*, Senior
Assistant Attorney General, *Peter C. Kissel*, and *Elisa J.
Grammer* were on the brief for California Department of Water
Resources.

*Robert H. Solomon*, Deputy Solicitor, Federal Energy
Regulatory Commission, argued the cause for respondent. With

him on the brief were *Cynthia A. Marlette*, General Counsel, *Dennis Lane*, Solicitor, and *Judith A. Albert*, Attorney.

*Michael E. Ward*, *Anthony J. Ivancovich*, *Mark D. Patrizio*, *Stuart K. Gardiner*, *E. Gregory Barnes*, *Michael D. Mackness*, and *Ellen A. Berman* were on the brief for intervenors California Independent System Operator, et al. in support of respondent. *Jennifer L. Key* and *J. Phillip Jordan* entered appearances.

Before:  SENTELLE, RANDOLPH, and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*:  The Sacramento Municipal Utility District ("Sacramento") sought an order from the Federal Energy Regulatory Commission compelling the major California utilities[1] to continue providing it with long-term firm transmission service.  Sacramento asserted a right of first refusal under the Commission's "Order No. 888."[2]  The Commission

---

[1] Pacific Gas & Electric Co., San Diego Gas & Electric Co., Southern California Edison Co. (collectively "California utilities").

[2] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, F.E.R.C. Stats. & Regs. ¶ 31,036 (1996), 61 Fed. Reg. 21,540 ("Order No. 888"), *order on reh'g*, F.E.R.C. Stats. & Regs. ¶ 31,048 (1997), 62 Fed. Reg. 12,274 ("Order No. 888-A"), *order on reh'g*, 81 F.E.R.C. ¶ 61,248 (1997) ("Order No. 888-B"), *order on reh'g*, 82 F.E.R.C. ¶ 61,046 (1998) ("Order No. 888-C"), *aff'd*, *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York*

rejected Sacramento's request in two orders: *Sacramento Municipal Utility District v. Pacific Gas & Electric Co.*, 105 F.E.R.C. ¶ 61,358 (2003) ("Initial Order"), *reh'g denied*, *Sacramento Municipal Utility District v. Pacific Gas & Electric Co.*, 107 F.E.R.C. ¶ 61,237 (2004) ("Rehearing Order"). This petition for judicial review followed.

Commercial relations between Sacramento and the California utilities are governed by private contractual arrangements made in accordance with public tariffs approved by the Commission. Before 1996, vertically integrated utilities provided bundled electricity generation, transmission, and distribution services to both retail and wholesale customers. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 681 (D.C. Cir. 2000). Municipalities and other small utilities often required more electricity to serve their customers than they could generate. Such utilities secured additional power through long-term contracts. In August 1967, Sacramento entered into a power transmission agreement with the California utilities. Like many contracts of its era, the Sacramento agreement provided for long-term firm physical transmission service. Sacramento could demand two hundred megawatts of capacity along a specified transmission path at any time throughout the duration of the contract.[3] For municipal governments with stringent quality-of-service obligations to

_____

*v. FERC*, 535 U.S. 1 (2002).

[3] In the Commission's parlance, "firm" service is distinguished from "non-firm" service by its certainty. Firm service is contractually guaranteed; non-firm service is scheduled on an "as available" basis and is subject to interruption. *Compare* Order No. 888, F.E.R.C. Stats. & Regs. ¶ 31,036 at 31,931 (defining "firm" service), *with id.* at 31,932 (defining "non-firm" service).

their retail customers, these long-term contracts provided a reliable mechanism to ensure "sufficient long-term firm transmission capacity to import all of the long-term power supplies [they had] under contract." Brief of Petitioner at 4.

In 1996, the Commission ordered the national deregulation of electricity transmission services. Order No. 888 required utilities to "unbundle" their electricity generation and transmission services and to file new "open access" tariffs – modeled on a *pro forma* tariff included in the rulemaking – guaranteeing non-discriminatory access to their transmission facilities by competing generators. *See* Order No. 888, F.E.R.C. Stats. & Regs. ¶ 31,036 at 31,635-36. The Commission recognized that the transition to an open access regime would have significant implications for long-term contract-holders. *See id.* at 31,662-63. Municipalities and other customers who required the "certainty and continuity" of long-term firm service, *Transmission Access Policy Study Group*, 225 F.3d at 735, could have found themselves at a disadvantage in a competitive market. To address these concerns, the Commission included in the *pro forma* tariff a provision granting all long-term firm transmission customers a right of first refusal to continue taking service upon expiration of their contracts.[4] Section 2.2 of the tariff provides that "[e]xisting firm service customers . . . have the right to continue to take transmission service . . . when the contract expires. . . . If at the end of the contract term, the [transmission system] cannot accommodate all of the requests for transmission service the existing firm service customer must agree to accept a contract term at least

---

[4] The Commission also declined to abrogate existing contracts, such as the 1967 Sacramento agreement, but noted that any new service taken upon expiration – including service taken under the right of first refusal – would be considered "new" service and be governed by the relevant open access tariff. Order No. 888, F.E.R.C. Stats. & Regs. ¶ 31,036 at 31,665.

equal to a competing request by any new [customer] and to pay the current just and reasonable rate . . .." Order No. 888-A, F.E.R.C. Stats. & Regs. ¶ 31,048 at 30,511. Although the parties refer to Section 2.2 as a "right of first refusal," it is more properly understood as a reservation priority. "If there are capacity limitations and both customers (existing and potential) are willing to pay for firm transmission service of the same duration, the right of first refusal provides a tie-breaking mechanism that gives priority to existing customers so that they may continue to receive transmission service." *Id*. at 30,197; *see also Idaho Power Co. v. FERC*, 312 F.3d 454, 457 (D.C. Cir. 2002). This right does not guarantee price or other terms; it is simply a "mechanism for allocating transmission capacity" to existing customers willing to match the terms of new customers. Order No. 888-A, F.E.R.C. Stats. & Regs. ¶ 31,048 at 30,197.

Although the order required utilities to file tariffs that contained the "non-rate terms and conditions set forth in the . . . pro forma tariff," Order No. 888, F.E.R.C. Stats. & Regs. ¶ 31,036 at 31,768; *see also* 18 C.F.R. § 35.28(c)(1), the Commission also recognized that its order was likely not the end of the road in an industry marked by transition. Order No. 888 allows future filings in which utilities may deviate from the terms of the *pro forma* tariff, so long as such deviations are "consistent with, or superior to" the terms in the *pro forma* tariff. Order No. 888, F.E.R.C. Stats. & Regs. ¶ 31,036 at 31,770. The Commission specifically anticipated the development of new market structures like independent service operators ("ISOs") – non-profit entities that administer the transmission grids of multiple operators – and articulated a set of principles to govern their operation. *See id.* at 31,730-32.

As the Commission was implementing Order No. 888, the California legislature and the state's Public Utility Commission were radically restructuring California's energy markets. A

1996 law chartered the California Independent System Operator ("California ISO"), an independent entity that would take over transmission operations from the California utilities and file a new tariff with the Commission. *See Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 397 (D.C. Cir. 2004). The California ISO operates under a service model quite different from that envisioned in Order No. 888. Instead of relying on long-term contracts, the California ISO allocates transmission capacity in "real time," based on hour-ahead and day-ahead scheduling requests from customers. *See* Paul L. Joskow, *California's Electricity Crisis*, 17 OXFORD REV. ECON. POL'Y 365, 370-72 (2001). Instead of providing long-term reservation of transmission capacity for a set price, the California ISO charges all customers an access fee and then adjusts its "congestion" pricing based on supply and demand. Any customer can, in effect, receive service at any time so long as it is willing to pay the necessary "congestion charges" to secure priority during peak demand periods. *See Pacific Gas & Elec. Co.*, 80 F.E.R.C. ¶ 61,128, at 61,428-29 (1997) ("*CAISO I*").

The Commission found the California ISO tariff consistent with the broad non-discrimination goals of Order No. 888. *See Pacific Gas & Elec. Co.,* 81 F.E.R.C. ¶ 61,122, at 61,435, 61,446 (1997) ("*CAISO II*"). To manage the transition to a new regulatory regime and a completely new service model, the Commission again declined to abrogate existing contracts and ordered customers to take service under the California ISO tariff upon contract expiration.[5] *Id.* at 61,463-65. The California ISO tariff does not contain a right of first refusal provision. The Commission explicitly approved the absence of such a

---

[5] The existing contracts are considered "encumbrances" on the California ISO. *CAISO II*, 81 F.E.R.C. at 61,472. Because providing service under old models is a significant administrative burden, the tariff prohibits new or increased service under open access tariffs. *Id*.

provision, noting that "[t]he ISO's proposal to schedule transmission on a day-ahead and hour-ahead basis is not compatible with the long-term reservation of discrete physical transmission rights." *Id*. at 61,472. To achieve consistency with the California utilities' Order No. 888 tariffs, which governed service until the ISO commenced operations, the Commission struck the Section 2.2 right of first refusal provision from the California utilities' tariffs, replacing it with a clause honoring existing contracts only for the term of the contract. *Id*. at 61,472 n.196.

The Commission nevertheless found that the California ISO tariff would not provide service "as good as or superior to" that provided under Order No. 888 without some instrument for hedging the risk of congestion charges. *CAISO I*, 80 F.E.R.C. at 61,427. This was especially so for incumbent customers with previously guaranteed service. *Id.* ("We are also concerned about potential discrimination between new market participants and participants with existing long-term transmission contracts."). The California ISO proposed a system of "firm transmission rights" – tradeable financial instruments that protect against significant fluctuations in congestion pricing. *See Cal. Indep. Sys. Operator Corp.*, 87 F.E.R.C. ¶ 61,143, at 61,570 (1999) ("*CAISO III*"). The Commission conditionally approved the proposal, finding these financial instruments to be a sufficient substitute for firm physical transmission rights. *Id.* at 61,572; *see also Cal. Indep. Sys. Operator Corp.*, 88 F.E.R.C. ¶ 61,156, at 61,525 (1999) ("*CAISO IV*") ("We have determined that [firm transmission rights] need not provide customers with firm physical transmission rights in order for them to secure transmission service that is as good as or superior to the service under the Order No. 888 pro forma tariff."). Although the Commission had previously noted that a right of first refusal mechanism might be appropriate in the context of a transmission rights proposal, *CAISO II*, 81 F.E.R.C. at 61,473, the proposal

approved in *CAISO III* did not contain such a provision. The Commission did, however, order the California ISO to develop and report on plans for longer-term financial rights, finding the one-year term to be inadequate. *CAISO III*, 87 F.E.R.C. at 61,572; *see also CAISO IV*, 88 F.E.R.C. at 61,525. The Commission took no further action on the transmission rights proposal, choosing instead to fold it into a comprehensive market redesign proceeding initiated in the aftermath of the California energy crisis.

Shortly before its contract with the California utilities was set to expire, Sacramento informed the companies that it wished to extend the terms of the contract or invoke its right of first refusal under Order No. 888. When the California utilities demurred, Sacramento filed a complaint with the Commission. The Commission declined to order the relief sought, noting that "[Sacramento] would have to take service under the CAISO tariff, the only relevant tariff since the California utilities have turned over operational control of their transmission facilities to the CAISO." Initial Order, 105 F.E.R.C. at 62,615; *see also* Rehearing Order, 107 F.E.R.C. at 62,010 ("[T]he Commission-approved CAISO tariff is the relevant tariff here for transmission service and that tariff supersedes the Order No. 888 *pro forma* tariff.").

In light of the developments described above, the Commission's actions can hardly be said to be "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A); *see Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004). The Commission engaged in a straightforward application of the relevant tariffs and orders. Even before the ISO commenced operations, the California utilities' open access tariffs had been stripped of their right of first refusal provisions. *CAISO II*, 81 F.E.R.C. at 61,472 n.196. Now that the California utilities have ceded their transmission operations to the

California ISO, they no longer offer service under the open access tariffs; requests for service upon expiration of existing contracts are governed by the California ISO tariff. *Id.* at 61,472. As described above, that tariff does not contain a right of first refusal provision. "Such concepts," the Commission said, "no longer have meaning in the context of the CAISO's day-ahead and hour-ahead transmission scheduling system." Initial Order, 105 F.E.R.C. at 62,615. Sacramento cannot assert a right it no longer has and it cannot take service under a business model that no longer exists.

There is nothing to Sacramento's argument that the Commission's orders amount to a new rule promulgated without notice and comment and improperly applied retroactively. For reasons already mentioned, the Commission engaged only in the application of an existing rule; it did not alter any aspect of Order No. 888 or the California ISO orders.

Sacramento ultimately challenges the validity of the California ISO tariff itself, arguing that its system of congestion pricing and firm transmission rights – and the absence of an Order No.888-style right of first refusal – fails to provide a service that is as good as or superior to that under the Order No. 888 *pro forma* tariff. *See, e.g.*, Brief of Petitioner at 28-30; Reply Brief at 11-12. But the California ISO tariff is not before us. Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), grants this court jurisdiction only over petitions for review within sixty days following the Commission's denial of rehearing. The Commission proceedings approving the California ISO tariff and the firm transmission rights proposal took place in 1997 and 1999, respectively. Because the time for seeking judicial review has long passed, Sacramento's argument amounts to an impermissible collateral attack on the previously approved California ISO tariff. *See, e.g.*, *City of Nephi v. FERC*, 147 F.3d 929, 934-35 (D.C. Cir. 1998); *Ga. Indus. Group v.*

*FERC*, 137 F.3d 1358, 1363-64 (D.C. Cir. 1998); *Transwestern Pipeline Co. v. FERC*, 988 F.2d 169, 174 (D.C. Cir. 1993). While agency rules can at times be challenged on substantive grounds when they are applied, even though the statutory period for judicial review has expired, none of the typical conditions for allowing this are present. Sacramento does not object to the Commission's constitutional or statutory authority, *e.g.*, *Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34-35 (D.C. Cir. 1999); the Commission, through its orders in this case, has not effectively reopened the California ISO orders, *e.g.*, *Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 150-52 (D.C. Cir. 1990); and the orders did not fail to place the parties on notice of what would be required. *E.g.*, *S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 44-45 (D.C. Cir. 2005) (citing *Dominion Res., Inc. v. FERC*, 286 F.3d 586, 590 (D.C. Cir. 2002)). As to the last consideration, the order approving the California ISO tariff explicitly addressed (and dismissed) concerns – raised by one of the intervenors in this case, *see CAISO II*, 81 F.E.R.C. at 61,467 (California Department of Water Resources) – about the absence of a right of first refusal. *Id.* at 61,472-73. The Commission also approved the firm transmission rights proposal in the face of an objection that the proposal was inconsistent with Order No. 888. *CAISO III*, 87 F.E.R.C. at 61,572. Sacramento participated in all of those proceedings. *See CAISO II*, 81 F.E.R.C. at 61,591 (listing Sacramento as intervenor); *CAISO III*, 87 F.E.R.C. at 61,583 (same). A reasonable firm in Sacramento's position would have understood the Commission's approvals to "mean[] what the Commission now says [they] mean[]." *Dominion Res.*, 286 F.3d at 589-90 (internal quotation marks omitted).

We therefore deny Sacramento's petition for review in part and we dismiss it to the extent that it collaterally attacks the Commission's California ISO orders.

*So ordered.*