**PACIFIC GAS AND ELECTRIC COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 07–352C.

United States Court of Federal Claims.

May 29, 2009.

Kerry C. Klein, San Francisco, California, for Plaintiff.

J. Reid Prouty, with whom were Gregory G. Katsas, Assistant Attorney General, Jeanne E. Davidson, Director, and Mark A. Melnick, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., and Clair Douthit, Western Area Power Administration, of Counsel, for Defendant.

### OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

WHEELER, Judge.

In this breach of contract action, the Court is faced with a threshold question of whether a binding contract exists for the services rendered. Plaintiff Pacific Gas and Electric Company ("PG & E") asserts that, after the Federal Energy Regulatory Commission ("FERC") approved a Grid Management Pass Through Tariff (the "Tariff"), the Tariff became a binding contract between PG & E and the Western Area Power Administration ("Western"), an agency within the United States Department of Energy. In the alternative, PG & E alleges that the parties formed an implied-in-fact contract for services under the terms of the Tariff. PG & E seeks payment for services rendered to Western from 2001 through 2004 under the alleged contract. The case is before the Court on the parties' cross-motions for summary judgment.

For the reasons stated below, the Court finds that FERC's approval of the Tariff did not automatically create a contract between PG & E and Western, but that genuine issues of material fact exist on whether the parties formed an implied-in-fact contract for the services that are the subject of the Tariff. While Defendant may ultimately show that there was no meeting of the minds between PG & E and Western regarding the Tariff, or, conversely, PG & E may show that an implied-in-fact contract was formed, the outcome of this issue is heavily fact dependent. The briefing on the pending motions has demonstrated that the parties disagree on many of the relevant facts of the case and

that a trial will be necessary to resolve the material fact issues. Accordingly, Plaintiff's motion for summary judgment is DENIED, and Defendant's cross-motion for summary judgment is GRANTED to the extent that the Tariff did not automatically create a binding contract, but is otherwise DENIED.

### Factual Background

In 1996, FERC issued Order No. 888 encouraging the formation of Regional Transmission Organizations in the United States. *Western Area Power Admin. v. FERC*, 525 F.3d 40, 44 (D.C.Cir.2008). While FERC was implementing Order No. 888, the state of California chartered the California Independent Systems Operator ("ISO") as "an independent entity that would take over transmission operations from California utilities." *Id.*; (quoting *Sacramento Mun. Util. Dist. v. FERC*, 428 F.3d 294, 296–97 (D.C.Cir.2005)).

Prior to the start-up of the California ISO, most Californians obtained their electrical power from one of the State's three major privately-owned utilities, including PG & E. *Id.* The three California utilities each "operated its own control area, performing the coordination, administrative and maintenance duties needed to operate a reliable power system." *Id.* During this time, PG & E formed several contracts for electric transmission service, or "Control Area Agreements," with its customers. *Id.*

After its creation, the California ISO became the "transmission provider" in California. *See id.* It became responsible for managing the flow of electricity across the electric transmission facilities. *See id.* Before the California ISO could file a tariff, it had to obtain FERC approval because the markets overseen by the California ISO involved the "sale of electric energy at wholesale in interstate commerce" and it engaged in the transmission of electricity in interstate commerce. *See* 16 U.S.C. §§ 824(a), 824(b)(1) (2006). FERC, however, did not require electricity customers to take service immediately from the California ISO. Rather, FERC "declined to abrogate existing contracts and ordered customers to take service under the California ISO tariff upon contract expiration." *Sacramento Mun. Util. Dist.*, 428 F.3d at 297 (footnote and citation omitted). Therefore, Control Area Agreement customers continued to receive transmission service from PG & E until expiration of their existing contracts.

One such Control Area Agreement was Contract 2948A between PG & E and the United States Department of the Interior, Bureau of Reclamation, the predecessor to Western. Contract 2948A, executed on July 31, 1967, was for the sale, interchange and transmission of electric capacity and energy. Western delivers power from hydroelectric plants located in the central and western United States. Contract 2948A assisted Western in its mission by providing "load shaping;" giving Western access to PG & E's non-hydroelectric power to balance Western's hydroelectric supplies, and enabling Western to offer its customers reliable, uninterrupted service. Western, in turn, gave PG & E access to Western's excess hydroelectric power at prices lower than PG & E's average costs. Contract 2948A was in effect during the three-year period relevant to this case, but terminated on December 31, 2004.

Shortly after its formation, the California ISO filed its original Grid Management Charge with FERC in 1997. *Western Area Power Admin.*, 525 F.3d at 44. This Grid Management Charge was designed to recover the California ISO's start-up, administrative, and operating costs. *Id.* The charge was assessed on a monthly basis against all California ISO Scheduling Coordinators—the entities that were responsible for submitting schedules to the California ISO for use of the California ISO-controlled transmission system. *Id.* PG & E was a California ISO-certified Scheduling Coordinator for several of its Control Area Agreement customers, including Western. *Id.*; Pl.'s Mot. for Summ. J., Connor Decl. ¶ 2. In this role, PG & E was responsible for submitting schedules to the California ISO on Western's behalf for the transmission service that Western needed. Pl.'s Mot., Connor Decl. ¶ 2. As a result, PG & E was assessed Grid Management Charges from the California ISO reflecting the California ISO's administrative costs of running the grid and accommodating those schedules. *Id.* ¶ 3.

"In November 2000, the California ISO proposed a new Grid Management Charge for the period from January 1, 2001 to January 1, 2004." *Western Area Power Admin.*, 525 F.3d at 44. This revised Grid Management Charge unbundled the earlier single charge to better reflect the principle of cost causation. *Id.* (quotations omitted). Shortly after the California ISO proposed this revised Grid Management Charge methodology for 2001 through 2003, PG & E proposed the Tariff for Control Area Agreement customers, including Western, to "pass through the Grid Management Charges to those customers." *Id.* at 45. PG & E's Tariff was calculated to reflect the percentage that each Control Area Agreement customer's use of the transmission system contributed to the Grid Management Charge that the California ISO assessed PG & E. *Id.* Several parties objected to the Tariff, but FERC ultimately approved it. *See generally, id.* at 48–51 (discussing the history of FERC's approval of the Tariff through four opinions, *Cal. Indep. Sys. Operator Corp.*, 111 F.E.R.C. ¶ 63,008 (2005), *Cal. Indep. Sys. Operator Corp.*, 113 F.E.R.C. ¶ 61,135 (2005), *Cal. Indep. Sys. Operator Corp.*, 116 F.E.R.C. ¶ 61,224 (2006), and *Cal. Indep. Sys. Operator Corp.*, 118 F.E.R.C. ¶ 61,061 (2007)).

[redacted] Western and several other parties sought review of FERC's decision in the United States Court of Appeals for the District of Columbia Circuit. Western argued on appeal that the Tariff violated the *Mobile–Sierra* doctrine [1] because it altered the existing Contract 2948A. *Id.* at 53. The D.C. Circuit rejected Western's argument, finding that because the California ISO provided new services, the Tariff did not violate the *Mobile–Sierra* doctrine. *Id.* at 57. Western did not appeal the D.C. Circuit's decision.

In 2001, Western began to make payments to PG & E for Grid Management Charges allocated to it under the PG & E Tariff. From August 2001 to March 2003, Western paid PG & E a total of $8,297,037. Pl.'s Mot., Ottavis Decl. ¶¶ 2–4, 7. In March 2003, PG & E invoiced Western for services provided in November 2002, in the amount of $286,318.15. *Id.* ¶ 8. Western refused to pay the March 2003 invoice, and did not make any further payments to PG & E thereafter. *Id.* ¶ 9.

On June 5, 2007, Plaintiff filed the present action in this Court, alleging that Western breached a contract when it failed to reimburse PG & E for all of the Grid Management Charges. Compl. ¶ 1 (June 5, 2007). Plaintiff proffers two theories of recovery, the first being that Defendant breached an implied-in-fact contract for Scheduling Coordinator services performed by Plaintiff. *Id.* ¶¶ 37–41. Second, Plaintiff argues that FERC's approval of the Tariff operated to create a contractual obligation for which the United States is liable. *Id.* ¶¶ 44–48. Plaintiff seeks $5,489,880.71, as well as pre- and post-judgment interest, costs of suit and other expenses, and other relief as deemed just and proper. *Id.* at 9. On September 4, 2007, Defendant filed its answer and counterclaim, alleging that there was no contractual basis for Plaintiff to charge Western Grid Management Charge costs and that Western thus overpaid Plaintiff $8,297,037. Def.'s Ans. & Counterclaim ¶ 57 (Sept. 4, 2007). Plaintiff replied to Defendant's counterclaim on September 26, 2007. On November 29, 2007, the Court stayed this case temporarily pending the outcome of the related case before the D.C. Circuit, *Western Area Power Administration*, 525 F.3d 40. This Court lifted the stay on August 12, 2008, after the D.C. Circuit issued a mandate in this related case.

Plaintiff filed its motion for summary judgment on September 29, 2008, and Defendant filed its response and cross-motion for summary judgment on November 10, 2008. Plaintiff filed its reply and response on December 19, 2008, and Defendant replied on January 14, 2009. The Court heard oral argument on the cross-motions on March 25,

1. The *Mobile–Sierra* doctrine, which was established by *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) and *Federal Power Comm'n v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), prohibits a party to a FERC-jurisdictional contract from unilaterally proposing changes in rates and conditions that are not authorized by a contract. *Western Area Power Administration*, 525 F.3d at 53 (citation omitted).

2009. During the oral argument, the Court requested that the parties file supplemental briefs pertaining to the necessity of a contract for Defendant to be liable to PG & E under the Tariff. Plaintiff filed its supplemental brief on April 9, 2009 and Defendant responded on April 23, 2009.

## Discussion

### A. Standard of Review

When no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law, summary judgment under Rule 56 of the Court of Federal Claims ("RCFC") is appropriate. *See* RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.2001). The benefit of all presumptions and factual inferences runs in favor of the non-moving party when a court reviews a motion for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quotation omitted); *Lathan Co., Inc. v. United States,* 20 Cl.Ct. 122, 125 (1990) (citation omitted). The party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant must come forward with specific facts that give rise to genuine issues of material fact in order to survive a motion for summary judgment. RCFC 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quotation omitted). A fact is "material" if it has the potential to affect significantly the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" dispute occurs when a reasonable trier of fact could find in favor of the non-moving party based on the evidence presented. *Id.* A court should deny a summary judgment motion if the non-moving party produces sufficient evidence to raise a genuine issue of fact material to the outcome of the case. *See id.*

When cross-motions for summary judgment are presented, the Court evaluates each motion on its own merits and resolves all doubts and inferences against the party whose motion is being considered. *Tenn. Valley Auth. v. United States,* 60 Fed.Cl. 665, 670 (2004) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987)). The Court will deny both motions if, upon the required analysis, a genuine issue of material fact exists. *Id.*

### B. FERC's Approval of the Tariff Did Not Automatically Create a Binding Contract.

■ In its briefs and at oral argument, Plaintiff asserted that FERC's approval of the Tariff, without the need for a separate agreement, created a binding contract between PG & E and Defendant. However, without a separate contractual agreement between the parties, Defendant was not bound to accept new services from PG & E and, in turn, pay for those services.

PG & E asserts that "a valid tariff creates an express contract between the utility and any customer taking service under the tariff." Pl.'s Supp. Br. 2–3 (Apr. 9, 2009). PG & E chiefly relies upon *East Kentucky Power Cooperative, Inc. v. FERC,* 489 F.3d 1299 (D.C.Cir.2007), for the proposition that "a governmental entity that takes service under a FERC-approved tariff is bound to pay charges under the tariff, even in the absence of a separate contract." Pl.'s Supp. Br. 3. PG & E adds, "the United States Supreme Court recognized, '[u]ntil changed, tariffs bind both carriers and shippers with the force of law.'" *Id.* at 3 (citing *Lowden v. Simonds–Shields–Lonsdale Grain Co.,* 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939)).

Additionally, PG & E points to other court decisions holding that a tariff creates a contract between a utility and any customer taking service under the tariff. Id. at 4 (citing *Marcus v. AT&T Corp.,* 138 F.3d 46 (2d Cir.1998) and *Evanns v. AT&T Corp.,* 229 F.3d 837 (9th Cir.2000)). PG & E explains that, in *Marcus,* the Second Circuit described the tariff on file with the Federal Communications Commission ("FCC") "as 'the only contract between [the utility] and its customers.'" *Id.* (citing *Marcus,* 138 F.3d at 55–56). PG & E also cites the Ninth Circuit's decision in *Evanns,* holding that the terms of a tariff are considered law and a

utility's customers therefore are required to pay the tariff. *Id.* (citing *Evanns,* 229 F.3d at 840–41).

The cases PG & E cites, however, do not support the proposition that the FERC-approved tariff created a binding agreement between Defendant and Plaintiff as a matter of law. As Defendant notes in its Supplemental Brief, the court in *East Kentucky* did not require payment of a new tariff, but rather affirmed the application of a new tariff for a new service. Def.'s Supp. Br. 2 (Apr. 23, 2009) (citing *East Kentucky,* 489 F.3d at 1304). In East *Kentucky,* customers of a public utility challenged FERC's approval of new charges for electricity service. 489 F.3d at 465. Specifically, the customers argued that the services were already covered in existing contracts and FERC failed to engage in reasoned decision-making because its conclusion was inconsistent with previous determinations. *Id.* The D.C. Circuit denied the customers' petition for review, finding that FERC's decision to approve the tariff was rational. *Id.* at 465, 474. The D.C. Circuit, however, neither found the customers liable for the tariffs nor assessed damages against them. Rather, the action before the court was simply for administrative review of FERC's decision to approve the tariff and was not a determination of the obligations of the customers.

The Supreme Court precedent cited by PG & E also does not govern the present case. *Lowden* involves the relationship between a carrier and a shipper under the Interstate Commerce Act, 49 U.S.C. § 1, *et seq.,* rather than a FERC tariff. *See generally,* 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953. *Lowden* explains that the Interstate Commerce Act does not allow a shipper to deviate from the terms of an Interstate Commerce Commission tariff by disclaiming it. *Lowden,* 306 U.S. at 520, 59 S.Ct. 612. The Supreme Court explained that Section 6 of the Interstate Commerce Act forbids carriers from voluntarily giving shippers a discount from tariff rates. *Id.* at 520–21, 59 S.Ct. 612.

Thus, the Supreme Court reasoned that involuntarily discounts where also prohibited. *Id.* at 521, 59 S.Ct. 612. The relationship between a carrier and a shipper under the Interstate Commerce Act has no bearing on the present case.

With regard to *Marcus* and *Evanns,* both cases involved FCC tariffs rather than FERC-approved tariffs. PG & E argues that the rule annunciated in these cases applies equally to tariffs under FERC, citing *Constellation Energy Commodities Group, Inc. v. FERC,* 457 F.3d 14, 21 (D.C.Cir.2006) and *T & E Pastorino Nursery v. Duke Energy Trading and Marketing,* 268 F.Supp.2d 1240, 1247 (S.D.Cal.2003). Pl.'s Supp. Br. 4 n. 2. Neither *Constellation Energy* nor *T & E Pastorino,* however, explicitly or implicitly adopts PG & E's interpretation of the FCC cases. In *Constellation Energy,* the court merely held that, between two private parties, the maintaining and accepting of a tariff could be considered "entering an agreement," rather than that such a tariff automatically is an agreement. *See* 475 F.3d at 21. *T & E Pastorino* involved allegations of violations of ancillary service contracts governed by a tariff, demonstrating the existence of both a contract and a tariff. *See* 268 F.Supp.2d 1240, 1247.[2]

Plaintiff thus has failed to demonstrate that FERC's approval of the Tariff could and did create a binding contract between PG & E and Western. Accordingly, Defendant is entitled to summary judgment on this issue, and Plaintiff's motion for summary judgment is denied.

### C. *The Parties May Have Entered Into an Implied–in–Fact Contract.*

Plaintiff argues alternatively that Defendant's voluntary acceptance of PG & E's services created an implied-in-fact contract between the parties. While Plaintiff is correct that the circumstances surrounding the Tariff may demonstrate an implied-in-fact contract, genuine issues of material fact exist

---

**2.** Further, with regard to *Marcus,* the Second Circuit explained that the customers sought to enforce the terms and conditions of their agreements with the utility. 138 F.3d at 56. The court explained that the customers did not identi-

fy the source of the agreements and that the only possible source was the tariffs. *Id.* The Second Circuit, however, did not hold that the mere existence of the tariffs created an agreement between the parties.

regarding the behavior of the parties at the time in question. As such, summary judgment in favor of either Plaintiff or Defendant is inappropriate.

■ "[A]n implied-in-fact contract is founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *La Van v. United States*, 382 F.3d 1340, 1346 (Fed.Cir.2004) (internal quotations and citations omitted). The facts can demonstrate that two parties had a "meeting of the minds," and, although there is no written agreement, the parties do have a contract. *See Cities Serv. Gas Co. v. United States*, 205 Ct.Cl. 16, 500 F.2d 448, 452 (1974) (finding, without a written contract, that a "meeting of the minds" that the plaintiff would sell and deliver gas to the defendant and the defendant would purchase and accept delivery of the gas). "[T]he requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs." *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed.Cir.2003). To establish a contract implied-in-fact, a party must show:

> (1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government.

*Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1265 (Fed.Cir.2005) (emphasis omitted) (citing *Schism v. United States*, 316 F.3d 1259, 1278 (Fed.Cir.2002) (*en banc*)); *see also Hanlin*, 316 F.3d at 1328.

■ Here, Plaintiff alleges that the parties had a "meeting of the minds" as to the Tariff, creating an implied-in-fact contract. Pl.'s Mot. 14. Plaintiff asserts that Western took service under Plaintiff's Tariff and knowingly used Plaintiff as a Scheduling Coordinator to schedule transactions on Western's behalf with the California ISO. *Id.* (citing Conner Decl. ¶ 2); Hr'g Tr. 11 (Mar. 25, 2009). Plaintiff also alleges that Defendant "recogni[zed] its obligation to pay for PG & E's services," and paid more than $8 million in Grid Management Charges over a seventeen-month period. Pl.'s Mot. 14 (citing Ottavis Decl. ¶¶ 2–6, 17). Plaintiff further argues that Defendant's cessation of payment was due to a disagreement about the calculation of the charges, rather than any disagreement as to liability. Pl.'s Reply 18–19. To support its position, Plaintiff points to a slide presentation on Western's website, which Plaintiff interprets to show that Western was concerned solely with the amount of its payments to PG & E rather than whether it was contractually obligated to pay. *Id.* Plaintiff also cites a letter from a Western rates manager, which Plaintiff interprets as Western agreeing to pay PG & E, subject to resolving a billing dispute. *Id.* at 18.

Conversely, Defendant contends that the parties had no mutuality of intent to contract for the terms of the Tariff and that there was no unambiguous offer and acceptance. Def.'s Cross–Mot. 8 (Nov. 10, 2008). Defendant argues that, at the relevant time, it maintained that it had no obligation to pay Plaintiff under the Tariff. *Id.* Defendant adds that it made payments to Plaintiff under protest. *Id.; see also* Dietz Decl. ¶ 43. Defendant further claims that Western's seventeen month history of payments to Plaintiff does not evidence that Western intended to contract for new services under the Tariff. Def.'s Cross–Mot. 9. Defendant explains that Plaintiff took a two-pronged approach to passing the Grid Management Charges to Western: (1) through FERC's approval of the Tariff as a "new service;" and (2) through a modification to Contract 2948A. *Id.* Defendant alleges that it ceased payment to Plaintiff at the time that Plaintiff withdrew its attempts to recover payment through Contract 2948A. *Id.* Thus, Defendant contends that it made its previous payments provisionally, based upon Contract 2948A for which Defendant "could have conceivably been liable[,]" rather than as a concession of liability under the Tariff. *Id.* Defendant further disputes the meaning of the rates manager letter and slide presentation, arguing that neither document demonstrates Western's intent to contract. Def.'s Reply 10–11 (Jan. 14, 2009).

Thus, Plaintiff and Defendant have presented starkly different views of the facts relating to the parties' behavior at the rele-

vant times. As such, genuine issues of material fact exist regarding the formation of an implied-in-fact contract for services under the Tariff. While it may be that Defendant ultimately can show that there was no meeting of the minds between PG & E and Western, or that Plaintiff can show an implied-in-fact contract was formed, the outcome of those issues is heavily fact dependent. Summary judgment for either party is therefore inappropriate and a trial will be necessary to resolve the material fact issues.

D. *Summary Judgment on Damages is Inappropriate.*

Plaintiff further seeks summary judgment with respect to damages. Pl.'s Mot. 17. Given that Plaintiff's implied-in-fact contract theory of liability will proceed to trial, summary judgment as to damages is inappropriate.

E. *Defendant is Not Entitled to Summary Judgment Regarding its Counterclaim.*

In its cross-motion, Defendant seeks summary judgment on its counterclaim for the refund of $8,297,037 it previously paid to Plaintiff. Def.'s Cross-Mot. 12. Defendant argues that, because Plaintiff has no legal basis to money paid under the Tariff, this amount should be returned to Defendant. *Id.* Given that Plaintiff and Defendant may have had an implied-in-fact contract for the services rendered pursuant to the Tariff, Plaintiff may have a legal right to retain this amount. Thus, summary judgment on Defendant's counterclaim is inappropriate.

### Conclusion

Based upon the foregoing, Plaintiff's motion for summary judgment is DENIED. Defendant's cross-motion for summary judgment is GRANTED to the extent that the Tariff did not automatically create a binding contract, but is otherwise DENIED. The Court will convene a status conference with counsel for the parties to establish a schedule for trial.

IT IS SO ORDERED.

