**CONSTELLATION ENERGY COMMODITIES GROUP, INC. and Constellation NewEnergy, Inc., Petitioners**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Cincinnati Gas & Electric Company,
et al., Intervenors.

No. 11–1451.

United States Court of Appeals,
District of Columbia Circuit.

April 9, 2015.

David O. Dardis, Constellation Power Source, Inc., Baltimore, MD, Andrew Bradley Young, K & L Gates, LLP, Washington, DC, for Petitioner.

Beth Guralnick Pacella, Robert Harris Solomon, Esquire, Jennifer Shepherd Amerkhail, Federal Energy Regulatory Commission (FERC) Office of the Solicitor, Washington, DC, for Respondent.

Before: GARLAND, Chief Judge, ROGERS, Circuit Judge, and RANDOLPH, Senior Circuit Judge.

### JUDGMENT

PER CURIAM.

This petition for review of Federal Energy Regulatory Commission orders was presented to the court and briefed and argued by counsel. The court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). It is

**ORDERED AND ADJUDGED** that the petition for review be dismissed in part and denied in part.

Constellation Energy Commodities Group and Constellation NewEnergy (collectively "Constellation") petition for review of Commission orders allowing several load-serving entities to shift their seams elimination surcharge liabilities to Constellation. *See Midwest Indep. Transmission Sys. Operator, Inc.,* Nos. ER05–6–001, *et al.,* 131 FERC ¶ 61,173 (May 21, 2010) ("Initial Order"); *Midwest Indep. Transmission Sys. Operator, Inc.,* Nos. ER05–6–043, *et al.,* 136 FERC ¶ 61,244 (Sept. 30, 2011) ("Rehearing Order").

The issues in this case arise because the geographic boundaries of two regional transmission organizations ("RTOs")—Midwest Independent Transmission Operator Regional Transmission Organization ("Midwest") and the PJM Interconnection Regional Transmission Organization ("PJM")—align such that a large number of transactions are subject to "rate pancaking." A pancaked rate occurs when an electric power transmission travels over the transmission systems of more than one RTO and each RTO charges a separate fee, called a through-and-out rate. The transmission is thus subject to multiple transmission fees and "pancaked." *See Wabash Valley Power Ass'n v. FERC,* 268 F.3d 1105, 1116 (D.C.Cir.2001); *see also Ill. Commerce Com'n v. FERC,* 721 F.3d 764, 778 (7th Cir.2013) (describing pancaking as "exploiting a locational monopoly by charging a toll").

In 2003, the Commission determined that the configuration of Midwest and PJM produced rate pancaking when transmissions crossed the boundary, or "seam," between the RTOs. *Midwest Indep. Transmission System Operator, Inc.,* 104 FERC ¶ 61,105, PP 1, 33–35, 39 (2003). The Commission held that the assessment of through-and-out rates was therefore unjust and unreasonable and replaced the through-and-out rates with a single transitional seams elimination surcharge. *Midwest Indep. Transmission Sys. Operator, Inc.,* No. EL02–111–004, *et al.,* 105 FERC ¶ 61,212, PP 42–53 (Nov. 17, 2003) ("November 2003 Order").

This order left some load-serving entities receiving power from pre-existing con-

tracts paying through-and-out rates on those contracts in addition to the seams elimination surcharge. Concerned that "generators may benefit ... from the elimination of [through-and-out rates], and that those savings may not all be passed on to load-serving entities," the Commission developed a mechanism for load-serving entities to pass their seams elimination surcharges on to shippers. November 2003 Order at P 45. As part of the compliance filing process, load-serving entities "under existing contracts for delivered power" that continue to into the transition period may shift the relevant portion of the seams elimination surcharge to a supplier. *Id.* To do so, the load-serving entity must demonstrate that the supplier is the shipper for the transaction. *Id.*

A number of Michigan cities and other load-serving entities in the state filed shift-to-shipper claims to shift their surcharges to Constellation. Most of the claims were settled, and the remaining claims were addressed before the Commission. *Midwest Indep. Transmission Sys. Operator, Inc.,* No. ER05-6-001, *et al.,* 116 FERC ¶ 63,030, P 347 (Aug. 10, 2006) ("ALJ Determination"). Constellation challenges the Commission's ruling on these claims.

Constellation raises five separate claims. Three of them require application of a benefits test to the shift-to-shipper mechanism and are, therefore, collateral attacks on the Commission's November 2003 Order. We lack jurisdiction to review collateral attacks and so dismiss the petition as to these claims. On the remaining two claims, the Commission engaged in reasoned decision making and so we deny the petition as to these claims.

Constellation's first claim is that several Michigan cities should not be able to shift their seams elimination surcharge to Constellation because Constellation did not benefit from the elimination of the through-and-out rates. Such a rule would impose a benefits test on shift-to-shipper claims, limiting load-serving entities to shifting charges only to shippers who carry power across the seam. Paragraph 45 of the November 2003 Order set requirements for making a shift-to-shipper claim and a benefits test was not among them. November 2003 Order at P 45. The effort to insert such a test now represents a collateral attack on the earlier order. We lack jurisdiction to consider collateral attacks on earlier Commission orders and so dismiss the petition as to this claim. *See Pac. Gas & Electric Co. v. FERC,* 533 F.3d 820, 825 (D.C.Cir.2008); *Sacramento Mun. Util. Dist. v. FERC,* 428 F.3d 294, 299 (D.C.Cir.2005).

Second, Constellation claims that American Electric Power, which intervened in support of the Commission, should be liable for a portion of the shift-to-shipper claims asserted against Constellation. This is so, Constellation argues, because it was American Electric Power and not Constellation that carried the power across the seam between the RTOs. The administrative law judge agreed, ALJ Determination at PP 427, 433, 460–62, but the Commission reversed, finding that this sort of "ripple" claim is not permitted under Paragraph 45, even as a defense to liability, Initial Order at PP 375, 393; Rehearing Order at P 175. The November 2003 Order did not provide a defense to a shift-to-shipper claim based on the shipper's contractual situation with respect to its own suppliers. Therefore, the argument that the Commission should embrace this "ripple" defense is also a collateral attack on the original order and so we dismiss the petition as to this claim.

Third, Constellation argues that the load-serving entities' shift-to-shipper claims should be reduced because a portion of the power Constellation delivered to the

Michigan cities was purchased on the day-ahead and real-time markets internal to the Midwest Independent RTO and so did not cross the seam. But the November 2003 Order did not condition shift-to-shipper claims on the ultimate source of the power delivered to a load-serving entity. Constellation's attempt to insert such a condition is another collateral attack on the November 2003 Order and so we dismiss the petition as to this claim.

Fourth, Constellation argues that Michigan South Central's shift-to-shipper claim should have been reduced by 21.8% because Michigan South Central sold that amount of power to third parties during the transition period. The administrative law judge agreed, ALJ Determination at P 435, but the Commission rejected the claim, Initial Order at P 378. The Commission treated this as a claim by Constellation to reduce the shift-to-shipper liability based on a reduction in Michigan South Central's load from the test period to the transition period. A seams elimination surcharge will be "adjusted to reflect reductions in load served between the test period and the transition period." Initial Order at P 324. The record established that Michigan South Central's load exceeded its purchases from Constellation during the transition period, and that under its contracts, Constellation provided the same load during the test period and transition period. Initial Order at PP 378–79; Rehearing Order at P 172. The amounts of power purchased, used, produced, and sold by Michigan South Central were consistent with its assertion that it continued to use all of the Constellation-supplied power to serve its load during the transition period. Initial Order at P 378. Because the Commission reasonably concluded that Constellation has not demonstrated a known and measurable difference in Michigan South Central's load, or the amount served by the Constellation contract, from the test

period to the transition period, we deny the petition as to this claim.

Fifth and finally, Constellation argues that Bay City, Michigan could not shift its seams elimination surcharge to Constellation because CMS Energy, not Constellation, remained Bay City's contractual supplier. Based on the record, however, the Commission concluded that Constellation was Bay City's contractual counterparty for purposes of its shift-to-shipper claim. ALJ Determination at P 455; Rehearing Order at P 183; Initial Order at P 402. That determination was reasonable and based on substantial evidence. The Commission noted that Constellation purchased CMS Energy's wholesale power supply contracts, including the one with Bay City, and that Bay City consented to the assignment. ALJ Determination at PP 451–52. Constellation services that contract—delivering power to Bay City and billing it. ALJ Determination at P 452. In these circumstances it was reasonable to conclude that Constellation, and not CMS Energy, shipped power to Bay City; we deny the petition as to this claim.

For the reasons given, we dismiss in part and deny in part Constellation's petition for review.

Pursuant to Rule 36 of this Court, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after the disposition of any timely petition for rehearing or petition for rehearing *en Banc. See* FED. R.APP. P. 41(b); D.C. CIR. R. 41.